No. 22-30585

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**Katherine Muslow; Meredith Cunningham,**
*Plaintiffs-Appellants,*

v.

**Louisiana State University and Agricultural and Mechanical College, Board of Supervisors; Thomas Skinner, in his individual capacity; Larry Hollier; John Harman; Carlton Jones III, also known as Trey Jones,**
*Defendants-Appellees.*

---

On Appeal from the U.S. District Court for the
Eastern District of Louisiana
(No. 2:19-cv-11793-BWA-DPC)

---

## PLAINTIFFS-APPELLANTS KATHERINE MUSLOW'S AND
## MEREDITH CUNNINGHAM'S COMBINED OPENING BRIEF

---

Anne McGowan Johnson
Kelli Benham Bills
**TILLOTSON JOHNSON & PATTON**
1807 Ross Ave., Suite 325
Dallas, Texas 75201
214.382.3041 Telephone
214.292.6564 Facsimile
ajohnson@tillotsonlaw.com
kbills@tillotsonlaw.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## Plaintiffs-Appellants

Katherine Muslow
Meredith Cunningham

## Appellate Counsel for Plaintiffs-Appellants

Anne Johnson
Kelli Bills
Tillotson Johnson & Patton
1807 Ross Ave., Suite 325
Dallas, TX  75201

## District Court Counsel for Plaintiffs-Appellants

Franz Zibilich
Franz L. Zibilich, Attorney at Law
6611 General Diaz Street
New Orleans, LA  70124

Kyle D. Schonekas
Schonekas, Evans, McGoey & McEachin, LLC
909 Poydras Street, Suite 1600
New Orleans, LA  70112

Nelson S. Wagar, III
Wagar Hickman, LLC
1425 W. Causeway Approach
Mandeville, LA  70471

Christopher Williams
Williams Litigation, LLC
639 Loyola Ave., Suite 1850
New Orleans, LA  70113

Natasha Wilson
David F. Gremillion
Peter S. Koeppel
Koeppel LLC
2030 Saint Charles Avenue
New Orleans, LA  70130

## **Defendants-Appellees**

Board of Supervisors, Louisiana State University and Agricultural and
Mechanical College
Thomas Skinner
Larry Hollier
John Harman
Carlton Jones III, also known as Trey Jones

## **Counsel for Defendant-Appellees**

Jeff Landry
Louisiana Department of Justice

Dennis J. Phayer
Gregory C. Fahrenholt
5213 Airline Drive
Metairie, Louisiana  70001

Darren A. Patin
Hailey McNamara
3445 North Causeway Blvd., Suite 800
Metairie, Louisiana  70002

Maria Nan Alessandra
Kim Boyle
Phelps Dunbar LLP
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130

Craig R. Watson
Guice Anthony Giambrone, III
Amanda M. Plaiscia
Blue Williams, L.L.C.
3421 N. Causeway Blvd., Suite 900
Metaire, Louisiana  7002

                         /s/ *Kelli Benham Bills*
                         Kelli Benham Bills

## STATEMENT REGARDING ORAL ARGUMENT

This summary-judgment appeal involves multiple parties, multiple claims, and a large record. Given the complexity of the claims at issue and the large evidentiary record, Appellants-Plaintiffs Katherine Muslow and Meredith Cunningham request oral argument because they believe it will substantially aid this Court in its decision in this case.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................ii

STATEMENT REGARDING ORAL ARGUMENT ................................v

TABLE OF CONTENTS ..........................................................................vi

TABLE OF AUTHORITIES..................................................................viii

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED ..............................................................................1

STATEMENT OF FACTS ........................................................................2

A.  Muslow and Cunningham served as General Counsel and Staff Attorney, respectively, to LSU Health Sciences Center in New Orleans..................................................................................2

B.  Chancellor Hollier's controversial leadership of LSUHSC-NO was marked by wide pay disparities. ...............................................4

C.  The 2017 Market Study confirmed Plaintiffs' severe, historical underpayment. ..............................................................................7

D.  After the 2017 Market Study, Hollier rewarded his cabinet with significant raises, but not Muslow. .......................................10

E.  In 2018, LSU consolidated all legal services in the OGC, and Skinner welcomed Plaintiffs to his department............................15

F.  Immediately after raising pay concerns, Plaintiffs' transition to the OGC was stopped and they became the first "position retirements" in LSUHSC-NO history...........................................17

G.  After Plaintiffs filed EEOC charges, they were terminated. .........20

SUMMARY OF ARGUMENT .................................................................22

ARGUMENT .........................................................................................27

I.   This appeal is governed entirely by de novo review......................27

II.  The district court erred in granting summary judgment on Plaintiffs' EPA and Title VII retaliation claims............................27

A. Plaintiffs established prima facie retaliation based on Skinner's adverse employment actions immediately after they raised equal-pay concerns. ...................................29

B. At minimum, fact issues exist as to whether Defendants' proffered non-discriminatory reasons are pretextual. .........33

III. The district court erred in granting summary judgment on Plaintiffs' Equal Pay Act claims. ....................................................37

A. Plaintiffs established a prima facie pay-discrimination case. .................................................................................................38

1. LSU is indisputably an "employer," and the status of the other Defendants raises fact issues....................38

2. Plaintiffs established a prima facie EPA claim, including by showing that employees of the opposite sex were paid more for less work. ................43

B. The district court improperly placed the burden of proof on Plaintiffs, rather than requiring Defendants to explain the pay disparities....................................................50

IV. The district court improperly granted summary judgment on the Title VII and Section 1983 discrimination claims. ..................52

A. Title VII requires only similarly-situated comparators, but the district court still found that more lenient standard was not met...............................................................55

1. Muslow established comparators. ...............................55

2. Cunningham established comparators too...................62

B. Defendants' proffered nondiscriminatory reasons are irrelevant and cannot support summary judgment. ............66

V. Plaintiffs request reassignment on remand to ensure fair trial proceedings going forward. ...............................................................70

CONCLUSION .................................................................................................73

CERTIFICATE OF SERVICE...............................................................................75

CERTIFICATE OF COMPLIANCE.........................................................................76

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ahad v. Bd. of Trustees of S. Ill. Univ.,*
   No.15-cv-03308, 2021 WL 6118239 (C.D. Ill. Dec. 27,
   2021) ........................................................................... 45-46

*Alvarado v. Texas Rangers,*
   492 F.3d 605 (5th Cir. 2007) ....................................... 53, 56

*Arias v. Raimondo,*
   860 F.3d 1185 (9th Cir. 2017) ........................................... 28

*Badgerow v. REJ Props., Inc.,*
   974 F.3d 610 (5th Cir. 2020) ..................................... *passim*

*Beck-Wilson v. Principi,*
   441 F.3d 353 (6th Cir. 2006) .................................... *passim*

*Berry v. Parish,*
   834 F. App'x 843 (5th Cir. 2020) ...................................... 35

*Boaz v. FedEx Customer Info. Servs., Inc.,*
   725 F.3d 603 (6th Cir. 2013) ............................................. 69

*Brennan v. City Stores, Inc.,*
   479 F.2d 235 (5th Cir. 1973) ............................................ 44

*Brennan v. Victoria Bank & Tr. Co.,*
   493 F.2d 896 (5th Cir. 1974) ............................................ 47

*Brown v. Wal-Mart Stores East, L.P.,*
   969 F.3d 571 (5th Cir. 2020) ....................................... 32, 55

*Burrell v. Dr. Pepper/Seven Up Bottling Grp., L.P.,*
   482 F.3d 408 (5th Cir. 2007) ............................................ 35

*Burton v. Freescale Semiconductor, Inc.,*
   798 F.3d 222 (5th Cir. 2015) ............................... 36, 41, 68

*Chapman v. A.S.U.I. Healthcare & Dev. Ctr.*,
    562 F. App'x 182 (5th Cir. 2014)....................................................... 39, 41

*Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974).............................................................. 43, 44, 50

*E.E.O.C. v. Hernando Bank, Inc.*,
    724 F.2d 1188 (5th Cir. 1984).......................................................... 49

*E.E.O.C. v. Reichhold Chemicals, Inc.*,
    988 F.2d 1564 (11th Cir. 1993)..................................................... 46, 54

*Fallon v. State of Ill.*,
    882 F.2d 1206 (7th Cir. 1989).......................................................... 50

*Fontenot v. Safety Council of Sw. Louisiana*,
    16-84, 2017 WL 2831248 (W.D. La. June 28, 2017)........................... 69

*Furnco Const. Corp. v. Waters*,
    438 U.S. 567 (1978).......................................................................... 59

*Garcia v. Pro. Cont. Servs., Inc.*,
    938 F.3d 236 (5th Cir. 2019)................................................... 29, 32, 67

*Gee v. Principi*,
    289 F.3d 342 (5th Cir. 2002)...................................................... 34, 35

*Gray v. Powers*,
    673 F.3d 352 (5th Cir. 2012)............................................................ 39

*Guinaldo v. Board of Supervisors of La. St. Univ. & Agri. &
    Mech. College, et al.*,
    No. 20-154, 2020 WL 4584186 (E.D. La. Oct. 10, 2020).................... 13

*Guzman v. Allstate Assurance Co.*,
    18 F.4th 157 (5th Cir. 2021)........................................................ 50, 52

*Haire v. Board of Sup'rs of La. St. Univ. Agri. & Mech.
    College*,
    719 F.3d 356 (5th Cir. 2013)....................................................... 66, 68

ix

*Hodgson v. Brookhaven Gen. Hosp.*,
  436 F.2d 719 (5th Cir. 1970)............................................................51

*Jackson v. FedEx Corp. Servs., Inc.*,
  518 F.3d 388 (6th Cir. 2008)............................................................59

*Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*,
  512 F.3d 157 (5th Cir. 2007) ("Section 1983 and title VII
  are 'parallel causes of action.'") ........................................................53

*Lenzi v. Systemax, Inc.*,
  944 F.3d 97 (2d. Cir. 2019) ..............................................................57

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)..................................................................28, 37

*Miller v. Sam Houston State Univ.*,
  986 F.3d 880 (5th Cir. 2021)............................................................71

*Miranda v. B&B Cash Grocery Store, Inc.*,
  975 F.2d 1518 (11th Cir. 1992)........................................................53

*Mulhall v. Advance Sec., Inc.*,
  19 F.3d 586 (11th Cir. 1994)............................................................46

*Plemer v. Parsons-Gilbane*,
  713 F.2d 1127 (5th Cir. 1983)..............................................38, 48, 51

*Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*,
  810 F.3d 940 (5th Cir. 2015)............................................................55

*Riser v. QEP Energy*,
  776 F.3d 1191 (10th Cir. 2015)..............................................44, 45, 68

*Rodriquez v. Wal-Mart Stores, Inc.*,
  540 F. App'x 322 (5th Cir. 2013)......................................................30

*Rubinstein v. Administrators of Tulane Educational Fund*,
  218 F.3d 392 (5th Cir. 2000)............................................................33

*Scott v. U.S. Bank Nat'l Ass'n*,
  16 F.4th 1204 (5th Cir. 2021) ..........................................................30

*Seong Song v. JFE Franchising, Inc.*,
    394 F. Supp. 3d 748 (S.D. Tex. 2019) ................................. 29

*Siler-Khodr v. Univ. of Tex. Health Sci. Ctr.*,
    261 F.3d 542 (5th Cir. 2001) .............................................. 53

*Slabisak v. Univ. of Texas Health Sci. Ctr. at Tyler*,
    No. 4:17-CV-597, 2018 WL 4762121 (E.D. Tex. Oct. 2,
    2018) ................................................................................. 41

*Taylor v. United Parcel Serv., Inc.*,
    554 F.3d 510 (5th Cir. 2008) ....................................... 53, 56

*Thibodeaux-Woody v. Houston Comm. Coll.*,
    593 F. App'x 280 (5th Cir. 2014) ...................................... 51

*Turner v. Kan City. S. Ry. Co.*,
    675 F.3d 887 (5th Cir. 2012) .............................................. 55

*Washington Cnty. v. Gunther*,
    452 U.S. 161 (1981) ............................................... 54, 60, 61

*Watkins v. Tregre*,
    997 F.3d 275 (5th Cir. 2021) ..................................... *passim*

*Wirtz v. Lone Star Steel Co.*,
    405 F.2d 668 (5th Cir. 1968) .............................................. 40

## Statutes

28 U.S.C. § 1291 ...................................................................... 1

29 U.S.C. § 203(d) .................................................................. 39

29 U.S.C. § 206(d)(1) ........................................................ 37, 51

29 U.S.C. § 215(a)(3) .................................................. 27, 28, 29

42 U.S.C. § 2000e-2(a)(1) ...................................................... 33

42 U.S.C. § 2000e-3(a) ................................................ 28, 30, 31

# Other Authorities

29 C.F.R. § 1620.13 ...................................................................... 45

29 C.F.R. § 1620.14 ............................................. 44, 45, 46, 47

Fed. R. Civ. P. 56(a) ................................................................. 27

# JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 because this matter arises out of a final summary judgment order disposing of Plaintiffs' Title VII and Equal Pay Act claims and the district court's subsequent refusal to reconsider that order.

# ISSUES PRESENTED

1. Did the district court err in granting summary judgment against Plaintiffs on their retaliation claims when: (1) LSU rescinded Plaintiffs' employment contracts immediately after Plaintiffs raised pay equity concerns; and (2) LSU "retired" Plaintiffs' positions after Plaintiffs filed EEOC charges?

2. Did the district court err in granting summary judgment against Plaintiffs on their Equal Pay Act claims by: (1) refusing to find evidence of *equal* or *more* work for *less* pay established a prima facie case; or (2) improperly shifting the burden to Plaintiffs to defeat Defendants' proffered reasons for the pay disparities?

3. Did the district court err in granting summary judgment against Plaintiffs on their Title VII and Section 1983 discrimination claims by: (1) requiring "comparators" to have "identical" job descriptions; or (2) relying on justifications that postdated the discriminatory pay to find no showing of pretext as a matter of law?

4. Should this case be reassigned on remand?

## STATEMENT OF FACTS

This summary judgment appeal turns on multiple disputed fact questions. Why were a major university's general counsel and staff attorney abruptly "retired" after they raised pay equity concerns? Why was that general counsel paid significantly less over the course of her 16-year career than men who the university itself deemed "similarly situated?" Why was every female in the staff attorney's paygrade paid less than every male in that paygrade?

The district court answered all of those questions as a matter of law in favor of the university and its leaders. The following factual recitation demonstrates why summary judgment was improper and should be reversed.

### A.     Muslow and Cunningham served as General Counsel and Staff Attorney, respectively, to LSU Health Sciences Center in New Orleans.

LSU Health Sciences Center in New Orleans ("LSUHSC-NO"), a major public university, is home to six schools (including Medicine, Nursing, and Dentistry).  As part of the LSU system, LSUHSC-NO is governed by the Board of Supervisors for Louisiana State University Agricultural and Mechanical College (the "LSU Board" or "LSU").

2

Plaintiff/Appellant Katherine Muslow served as LSUHSC-NO's General Counsel for 16 years, providing legal counsel to the entire institution.[1] As one of only fifteen direct reports to LSUHSC-NO Chancellor Larry Hollier, Muslow was at the same level as vice-chancellors.[2] The LSU Board recognized "it would be very difficult to find someone who has Ms. Muslow's experience and institutional knowledge in the open market,"[3] but her salary of $182,475 (as of late 2015) was still far less than comparable general counsel at other academic health-science centers (who averaged $308,000 in 2016).[4]

Plaintiff/Appellant Meredith Cunningham was a Staff Attorney reporting to Muslow starting in May 2014.[5] Cunningham provided legal advice, handled litigation, and assisted with contracts and policies.

---

[1] ROA.16870, 9886; ROA.6408 (Muslow Depo. 61:9-13).

[2] ROA.9888 (organizational chart); ROA.1539, 6913, 6333 ("In that position [Muslow] served as a Vice Chancellor, and reported to the Chancellor of the LSUHSC").

[3] ROA.9912.

[4] ROA.9913; ROA.9911 (2010-2011 survey showing peer institutions paid chief legal counsel from $183,815 to $293,350); ROA.10058 (2016 survey across 61 medical schools showing $308,000 average and used to inform Market Study).

[5] ROA.16873; ROA.1538 (hiring date and salary).

Cunningham's salary was $127,500 for her entire tenure at LSUHSC-NO, prorated based on her 40% and then 60% of full-time status.[6]

## B. Chancellor Hollier's controversial leadership of LSUHSC-NO was marked by wide pay disparities.

In 2021, Defendant/Appellee Larry Hollier resigned after an internal investigation revealed favoritism, nepotism, and retaliation during his 15-year tenure as Chancellor of LSUHSC-NO.[7] LSU's Office of Internal Audit concluded that Hollier: (1) exercised "carte blanche" authority over personnel actions due to the lack of a comprehensive compensation policy[8]; (2) changed minimum job criteria to accommodate male candidates; (3) awarded additional compensation to male employees, to the detriment of female employees[9]; and (4) presided over a workplace in which female employees were retaliated against for assisting investigators.[10]

---

[6] ROA.9320, 9327.

[7] ROA.4729-4795, 10524.

[8] ROA.4731.

[9] ROA.4731-4732, 4766-4767, 4776-4777; *see also* ROA.16552.

[10] ROA.4732, 4769, 4778.

None of this was news to those who worked at LSUHSC-NO. For more than a decade, Chancellor Hollier had unfettered control over all personnel decisions and compensation. The LSU Board gave him "'carte blanche' authority" to set compensation for employees in his office, with no meaningful oversight, no compensation policy, no performance evaluation system for unclassified personnel (like Plaintiffs), and no objective way to assess pay equity among employees.[11] Nor was there any oversight over the "sparse" position descriptions for LSUHSC-NO jobs, some of which had not been updated since 1986.[12]

Red flags indicating compensation inequity were everywhere. When Richard Buhler, a Senior Contracts Administration Officer in the School of Medicine, received a 43.5% increase in his salary from Hollier in less than a year, his boss (the Medical School Dean) told Hollier this was "clearly unjust when everyone is notified that they are not eligible for the same consideration."[13] But nothing changed. When Hollier brought in new executives Matt Altier and Ed Murray in 2015 and 2016,

---

[11] ROA.4731, 16558, 16637, 16644-16645, 16650, 16653, 16599 (Hollier agreeing that evaluations in the chancellor's office were "pretty much subjective with [him]self").

[12] ROA.6657-6658, 12494, 10130-10155, 10176-10178, 10196-10198, 16632.

[13] ROA.12521, 16789.

they were paid $215,000 and $243,000, even though they had no experience at LSUHSC-NO compared to Muslow's 16+ years of experience at the time.[14]

Muslow eventually approached Hollier about these wide salary discrepancies in late 2015, and he agreed to raise her salary from $161,049 to $182,475, still far below her peers at LSUHSC-NO and at similar institutions.[15]

Other Defendants actively participated in this "carte blanche" era of compensation at LSUHSC-NO. Hollier blamed John Harman, Vice Chancellor for Administration and Finance from March 2017 until July 2020, as responsible for Plaintiffs' salaries, even though Harman reported to Hollier.[16] Defendant/Appellee Trey Jones, Deputy General Counsel under Skinner, also participated in decisions underlying Plaintiffs' claims.[17]

---

[14] ROA.9923.

[15] ROA.9913, 10058.

[16] ROA.12556, 16578, 16581; *see also* ROA.16654. Hollier ultimately fired Harman for retaliatory conduct. ROA. 12617, 16583-16584, 16670 ("general atmosphere" of "retaliation").

[17] ROA.1560, 16603, 16605, 16683, 16695.

And then there was Defendant/Appellee Thomas Skinner, who led LSU's Office of General Counsel ("OGC") and, later, the Title IX Office, a tenure also marked by controversy.[18] Skinner admitted he blocked Plaintiffs' transition to the OGC because they raised gender-pay equity concerns, among other things.

## C.    The 2017 Market Study confirmed Plaintiffs' severe, historical underpayment.

In 2016, a new Human Resources Director, Rosalyn Martin, began to evaluate employee compensation.[19] Based on her concerns, Martin commissioned the *2017 Unclassified Employee Market Study* (the "Market Study"), a key document in this lawsuit.[20]

The Market Study created "job families" and hierarchical paygrades. Positions were grouped within the same family and/or paygrade because they shared comparable skills, responsibilities, and

---

[18] After Skinner left, the LSU Board retained Husch Blackwell to investigate various Title IX-related incidents. ROA.12641-12790. The investigation concluded that, during Skinner's tenure, "there was a lack of effective leadership at the University with respect to Title IX" and "the University was slow to adopt Title IX policies, hire personnel, or meaningfully address concerns identified by community members and internal and external reviews." ROA.12646. Skinner's service as both general counsel and supervisor of the Title IX office was specifically flagged as presenting a conflict of interest. ROA.12652-12653.

[19] ROA.16632.

[20] ROA.9914-9921 (R.E. 173-200); ROA.12488-12499.

scope, making them "similar[ly] situated."[21] Within each paygrade, there was a salary range, with the lowest end (1st Quartile) for those with less than five years of experience, and the highest end (4th Quartile) for those with more than 15 years of experience.[22] The immediate goal of the Market Study was to bring every position up to at least the *minimum* salary for its paygrade, with the long-term goal of ensuring every salary was at the *midpoint* of its paygrade.[23]

The Market Study revealed that Muslow's salary was farther below the minimum for her paygrade than any other unclassified LSUHSC-NO employee (by more than $45,000).[24]



---

[21] ROA.9917 (R.E. 176); ROA.12491, 16641-16643, 16661-16662.

[22] ROA.9921 (R.E. 180); ROA.10064 (R.E. 201).

[23] ROA.12496, 16648, 16654.

[24] ROA.10064 (R.E. 201); ROA.16903.

Cunningham's salary of $127,500 was also well below the $162,242 midpoint for her N37 paygrade (just 78.6% of that number).[25] In fact, the entire N37 paygrade was flagged by Human Resources because female salaries in that paygrade were all significantly below male salaries.[26] Cunningham was also told that because she worked part-time, she could not be considered for any equity pay adjustments.[27] Most part-time employees at LSUHSC-NO were female.[28]

Significantly, the Market Study also did not consider any additional compensation—"perks" such as auto allowances—which Hollier generously awarded only to male direct reports.[29]

---

[25] ROA.10064 (R.E. 201); ROA.16901.

[26] ROA.12607.

[27] ROA.16657.

[28] ROA.16657.

[29] ROA.16659; ROA.12520 (over a five-year period, showing $62,500 auto allowances paid to Demetrius Porche, Dean, School of Nursing; $62,500 to Jimmy Cairo, Dean, School of Allied Health; $62,500 to Steve Nelson, Dean, School of Medicine; $62,500 to Joe Moerschbaecher, Vice Chancellor Academic Affairs and Dean, Graduate School; $58,225.81 to Henry Gremillion, Dean, School of Dentistry; $62,500 to Dean Smith, Dean, School of Public Health; and, $21,193.55 to Harman); ROA.4758-4759, 6652, 6664, 16552, 16601, 16606, 16611.

**D.    After the 2017 Market Study, Hollier rewarded his cabinet with significant raises, but not Muslow.**

In late July 2017, Hollier raised Muslow's salary to $212,475.[30] Hollier knew that was still $15,000 below the minimum salary for her paygrade in the 2017 Market Study, but he kept that secret from Muslow.[31]

There was no excuse for Muslow's below-minimum salary, especially after the Market Study, so Defendants blamed each other. Martin blamed Hollier, expressing her adamant disagreement with Hollier's below-minimum adjustment to Muslow's salary.[32] Hollier blamed Harman and "HR."[33] Harman blamed Hollier and Martin.[34] But no one blamed Muslow, at least until after Martin raised pay equity

---

[30] ROA.10066, 16769.

[31] ROA.10064 (R.E. 201); ROA.16582, 16673.

[32] ROA.16651 ("The recommendation was to bring everyone to the minimum. And I'm seeing that this salary is below. So we need to take action and move forward with at least bringing this person to the minimum."); ROA.16645, 16653 (no performance documentation for Muslow or Cunningham); ROA.16646, 16650, 16654.

[33] ROA.16594-16595.

[34] ROA.16558.

concerns.[35] LSU has never identified a single contemporaneous document to support any performance issues for Muslow.[36]

Muslow eventually discovered that her salary fell below the minimum for her paygrade,[37] and received (after asking) her "position description," which made her job sound like a staff attorney, not the general counsel of LSUHSC-NO.[38] After being pressed again, Hollier eventually agreed to increase Muslow's salary to the bare minimum for her paygrade, which makes no sense given Muslow's 16+ years of experience.[39]

---

[35] ROA.16645, 16647-16648, 16591 (no formal complaints against Muslow).

[36] Any "performance issue" excuse is also belied by the fact that the only other woman executive who directly reported to Hollier, Leslie Capo, received the same salary mistreatment. Rather than adjust her salary to the $147,238 minimum for her paygrade, Hollier adjusted it to just $134,122. ROA.9927, 16594, 16903. He did the same for another woman working in the Chancellor's Office, Remy Allen, adjusting her pay to $101,935 instead of the $108,270 minimum for her N36 paygrade. ROA.9922, 9927.

[37] ROA.16758-16759, 16774-16780.

[38] ROA.16801-16803. Failing to consider Muslow's actual job responsibilities led to an undervaluing of her position (i.e., a lower paygrade). ROA.6658-6659.

[39] ROA.10067, 16548.



Muslow's "bare minimum" salary stood in stark contrast to numerous men within the Chancellor's Office who held positions in paygrades *lower* than Muslow's N43, yet earned close to or substantially more than Muslow's $182,457 salary (before July 2017) and her $227,520 salary (after July 2017):[40]

- Demetrius Porche (N42) made $237,915;

- Edwin Murray (N41, 80% effort) made $243,750;

- Timothy Fair (N39) made $240,000;

- Jimmy Cairo (N41) made $260,706;

- Matt Altier (N41) made $215,000;

---

[40] ROA.9922-9941 (R.E. 181-200); ROA.10067.

- Bernard Lousteau (N41) made $183,467;

- Brent Herold (N41) made $185,000;

- John Ball (N40) made $186,221; and

- Matthew Gedge (N37) made $180,743, just $1,732 less than Muslow's pre-July 2017 salary.[41]

Keith Schroth made $172,000 *more* than Muslow, even though he was just one paygrade above her and had less experience.[42]

The disparities in Cunningham's N37 paygrade were marked too. All three women in the N37 paygrade were paid well below the $162,242 midpoint, while the salaries of the two N37 men exceeded the midpoint, one at $167,757 (Roy Clay) and the other at $180,743 (Matthew Gedge).[43]

---

[41] ROA.9922-9931.

[42] ROA.9928, 9937, 16750.

[43] ROA.9928-9930. This led to another N37 female filing suit against LSU for discrimination. *Guinaldo v. Board of Supervisors of La. St. Univ. & Agri. & Mech. College, et al.*, No. 20-154, 2020 WL 4584186 (E.D. La. Oct. 10, 2020). That case eventually settled. *Id.*, No. 2:20-cv-00154-BWA-MBN, Dkt. 71 (Order granting approval of settlement).



Outside the Chancellor's Office, Richard Buhler's salary exceeded Cunningham's by $1,345 and, later, by $25,389, even though he was in a lower paygrade.[44]

Those disparities got even wider when, in late 2018, Hollier arranged for a second round of raises for eleven executives (but not Muslow), in addition to substantial supplemental benefits unaccounted for in the Market Study.[45] Around the same time, Muslow finally

---

[44] ROA.9922-9941 (R.E. 181-200); *compare* ROA.16901, *with* ROA.16962.

[45] ROA.16750. As just one example, the Market Study reflected that Henry Gremillion, the Dean of the School of Dentistry, made $280,800 and received a 2% "equity" increase to $286,416. ROA.9923, 9928. Hollier's letter just a year later showed that the dean's *actual* pay exceeded the amount in the Market Study by $100,000 and, with the October 2018 increase, would exceed $400,000 (not including his car allowance). ROA.16750. Likewise, the Market Study indicated that Steve Nelson, the Dean of the School of Medicine, made $311,739, but Hollier's October

14

obtained a copy of the 2017 Market Study (through a public records request[46]) and saw how far her salary lagged behind those of her peers.[47]

Those unexplained pay discrepancies would continue through Plaintiffs' termination in mid-2019.

### E. In 2018, LSU consolidated all legal services in the OGC, and Skinner welcomed Plaintiffs to his department.

In 2018, LSU began to consolidate all legal services in the OGC (Skinner's department).[48] Muslow and Cunningham were to be transferred to the OGC "at their same compensation level" and were to report to Trey Jones.[49]

Skinner personally welcomed Muslow to the OGC, assuring her that she would receive "a new title of Chief Counsel of [LSU]HSC-NO, at the same compensation level" and the consolidation "really should not

---

2018 letter showed his pay exceeded $737,000 and was $762,814 with Hollier's October 2018 increase. *Compare* ROA.9922, *with* ROA.16750.

[46] ROA.10222.

[47] ROA.9757, 10222.

[48] ROA.16836-16839.

[49] ROA.16842-16843, 16291-16924, 16911.

affect [her] day to day work."[50] Plaintiffs both received an additional "welcome" email, describing the process for getting them "set up in our HR system," filling out an application, submitting appropriate documentation, and signing employment contracts.[51]

The application process was perfunctory, and Plaintiffs filled out the online application and submitted appropriate documentation.[52] Plaintiffs began receiving assignments from the OGC after January 2019.[53] They were also provided with employment contracts, which reflected the same bare-minimum salaries they had been paid under Chancellor Hollier.[54]

---

[50] ROA.16847; ROA.16848 (organizational chart reflecting reporting hierarchy through the OGC).

[51] ROA.16738, 16916.

[52] Harman testfied that "they would still be doing what they had been doing but that their work may be a little more directed by, you know, the Office of General Counsel, but they would have the same customers." ROA.16555 ("the attorneys would remain physically in New Orleans but they would report now to Tom Skinner and his group as opposed to directly to the chancellor"); ROA.16560, 16711-16712, 16716, 16740, 16743, 16806, 16819-16825, 16827.

[53] ROA.16675; *see also* ROA.16836-16839.

[54] ROA.16739, 16850-16852 (Muslow's employment contract); ROA.16817-16818 (Cunningham's employment contract).

**F.   Immediately after raising pay concerns, Plaintiffs' transition to the OGC was stopped and they became the first "position retirements" in LSUHSC-NO history.**

On February 15, 2019, Muslow sent an email to her new boss, Skinner, requesting a review of her and Cunningham's salaries and raising concerns about gender pay equity.[55]

Skinner immediately understood that Muslow was expressing concern that there was "potentially a pay disparity between males and females at [LSUHSC-NO]."[56] Skinner responded swiftly and decisively. In just one business day, he rescinded Muslow's and Cunningham's employment contracts and halted their transfer to the OGC.[57] He admitted that the *cause* of those actions was Muslow's 2/15/19 email, which he described as "the straw that broke the camel's back."[58] Skinner

---

[55] ROA.16947-16948 (R.E. 202-203).

[56] ROA.16696-16697.

[57] ROA.10083-10084 (R.E. 204-205); ROA.9365-9366 (R.E. 206-207). Skinner never conclusively stated whether Muslow and Cunningham "belonged to" LSUHSC-NO or the OGC after January 1, 2019, even though Hollier said they had already transferred. ROA.16691.

[58] ROA.16701.

testified "it was my decision to retract those letters [contracts] *because* I was so taken aback by Ms. Muslow's email."[59]

Three days later, Skinner forwarded Muslow's 2/15/19 email to Hollier and suggested for the first time that her employment contract could "expire[]" and did so without her accepting it.[60] Skinner told Hollier he "sent her a letter confirming the expiration and formally withdrawing it."[61]

But no expiration date exists on the employment contracts. Nor were Muslow and Cunningham ever told that failing to sign them by a particular date would stop their transfer to the OGC. Rather, several times in January and into February (after the supposed effective date of February 1), the OGC staff continued to work with Muslow and Cunningham to gather required documents.[62] Not once were Muslow and Cunningham told that their employment contracts could (or did) expire. And other employees, like Ed Jones (male general counsel for the health-

---

[59] ROA.16695 (emphasis added).

[60] ROA.16898 (R.E. 208).

[61] ROA.16898.

[62] ROA.16715, 16743.

sciences center in Shreveport), did not "apply" for their positions until later in February, with no adverse result (but instead a promotion and raise).[63]

After Skinner's abrupt withdrawal email and unclear about the status of their positions, Muslow sought clarification from Skinner and Hollier.[64] She reiterated that she and Cunningham were "on board with the transition of our office to OGC" and outlined the steps they had already taken to facilitate that process.[65]

Skinner forwarded Muslow's clarification email to Hollier, advising of his plan to openly advertise to fill the positions.[66] He asked Hollier for confirmation that Muslow's and Cunningham's positions would be "retired" by June 30, 2019.[67] Hollier responded, confirming the position

---

[63] ROA.12628, 16829-16833.

[64] ROA.16770.

[65] ROA.16770.

[66] ROA.16727-16728.

[67] ROA.16727-16728.

retirements and copied Muslow and Cunningham.[68] These would be the

first position "retirements" in the history of LSUHSC-NO.[69]

**G.     After Plaintiffs filed EEOC charges, they were terminated.**

After sending a third clarifying email to Hollier and Skinner with

no response, Muslow and Cunningham filed EEOC charges on March 26,

2019.[70]

On March 29, 2019, LSUHSC-NO informed Muslow and

Cunningham that their positions "will be eliminated and [their]

employment will be terminated effective close of business June 30,

2019."[71] *No one* from LSUHSC-NO has accepted responsibility for

drafting or sending the letters—not even Hollier, who signed them.[72] No

one from LSUHSC-NO has explained why the letters bear a date the day

*before* the EEOC charges (March 25), but were not mailed until *after* the

charges were filed (March 29).

---

[68] ROA.16726-16727, 16606-16610 (Hollier Depo. 248:13-25, 251:16-252:6, 253:10-258:5).

[69] ROA.16599 ("I don't recall eliminating positions other than these.").

[70] ROA.16729, 16751-16757, 16880-16881, 16890-16891.

[71] ROA.9373, 10091.

[72] ROA.16604-16605.

A few days later, on April 4, Muslow and Cunningham were told that their jobs would be publicly posted.[73] Trey Jones then asked Muslow and Cunningham if they intended to apply for the same positions they had held for years and should have already been transitioned to long before.[74] Muslow responded that they had taken all steps necessary and, as far as they knew, had already transferred to the OGC.[75]

A week later, Jones informed Muslow that he planned to add her to the pool of applicants for her position (even though she had not signed the employment contract).[76] Muslow's candidacy received high praise from members of the hiring committee based on her 16+ years of experience as LSUHSC-NO's General Counsel.[77] Yet, still having received no resolution to her outstanding requests for fair compensation, Muslow asked that she not be treated "as an 'applicant' for a position I have held going on eighteen years now. [Cunningham] concurs."[78]

---

[73] ROA.9374, 16718.

[74] ROA.9375, 16733.

[75] ROA.9377, 16735.

[76] ROA.9376, 16734.

[77] ROA.16917-16920.

[78] ROA.9376, 16734.

21

Cunningham's last day with LSUHSC-NO was June 28, 2019; Muslow's was July 15, 2019. They remain the only two LSU Board employees *ever* to have been involuntarily separated from employment due to the "retirement" of their positions.[79] They are also the only employees terminated due to the transition to the OGC; every other employee—all men—whose positions were affected by the transition ended up with either a promotion, a raise, or both. Muslow was later replaced by a man (Louis Colletta) who requested and immediately received a pay raise.[80]

This suit followed, in which Plaintiffs asserted various claims against LSU and the Individual Defendants, including for Equal Pay Act and Title VII discrimination and retaliation. The district court granted summary judgment for Defendants on those claims, prompting this appeal.

## SUMMARY OF ARGUMENT

Muslow and Cunningham established their prima facie case of both Title VII and EPA retaliation and discrimination and at least raised a

---

[79] ROA.16599.

[80] ROA.4741-4754.

fact issue as to every proffered reason for the adverse employment actions they indisputably suffered. But, at every turn, the district court resolved clear fact disputes as a matter of law, refused to consider evidence in the light most favorable to Muslow and Cunningham, and held them to incorrect, unduly rigid standards. The result was an improper summary judgment for Defendants. Reversal on each claim is warranted.

### *Title VII and EPA Retaliation Claims*

For months, Muslow and Cunningham were told they would automatically transfer to the OGC during the consolidation of legal services at LSU. Indeed, they received "welcome" emails and work assignments from the OGC. But then Muslow raised concerns about gender-pay equity. Suddenly, everything changed.

Within one business day of Muslow's pay-equity email, OGC head Skinner rescinded her and Cunningham's employment contracts and immediately halted their transition to the OGC.

This abrupt change happened for one simple reason: Muslow's pay-equity email. Skinner admitted as much, describing the email as the "straw that broke the camel's back" and the cause of his adverse

employment actions. And then their positions were "retired"—something that had *never happened* to any other employee at LSUHSC-NO.

LSU came up with several "non-discriminatory reasons" for its retaliatory terminations of Muslow and Cunningham, but all (save one) involve developments that post-date the retaliatory actions and therefore cannot support summary judgment as a matter of law. The only alleged "reason" offered is that the contracts "expired," but the contracts say no such thing and Muslow and Cunningham were never given a deadline to sign them. And of course, those contracts contained salary figures Plaintiffs claimed were discriminatory. Summary judgment on the retaliation claims was improper.

### *Equal Pay Act Claims*

Plaintiffs provided ample evidence to establish that they performed equal—and in fact *more*—work than male comparators at LSUHSC-NO, thus raising a prima facie case of EPA discrimination. Indeed, LSUHSC-NO's own Market Study—which grouped jobs by paygrade and job family based on their skill, effort, and responsibility—alone established the EPA's "equal work" standard. Multiple men in lower paygrades made as

much or more than Plaintiffs, raising at least a "serious question" under the EPA.

The district court ignored the Market Study and proceeded to reject every proffered comparator as not "identical" to that of LSUHSC-NO's General Counsel and Staff Attorney. That is not the legal standard, nor could it be. Otherwise, there could never be a comparator for a senior executive position like General Counsel, of which there will always be only one. Instead, the standard is one of substantial similarity, and LSU already did that work for the Court through the 2017 Market Study. The Market Study showed that male comparators in the same job family and lower paygrades made *more* money than Plaintiffs, foreclosing LSU's use of an "unequal work" excuse to avoid liability under the EPA.

Compounding its prima facie errors, the district court went on to improperly shift the burden to Plaintiffs to disprove any enumerated EPA affirmative defense. But it was unequivocally Defendants' burden to prove those defenses as a matter of law, not Muslow's and Cunningham's burden to disprove them. Defendants simply pointed to the Market Study's gender-neutral classification system as relieving

them from liability, but that only works if the system is applied methodically. It was not here.

### *Title VII and § 1983 discrimination claims*

For many of the same reasons, summary judgment on the Title VII discrimination claims was also wrong. The district court held Plaintiffs to the same impossible standard of identifying "identical" comparators, ignoring the Market Study and finding any minor difference in job function disqualified an individual as a comparator. It then went on to rely on reasons that post-dated the discriminatory pay decisions as sufficient to defeat Plaintiffs' claims, even though such reasons cannot as a matter of law. As to the only other pre-discrimination reasons Defendants offered, fact issues abound as to their legitimacy. But the district court improperly weighed those facts to grant summary judgment for Defendants.

Summary judgment on Plaintiffs' claims should be reversed and this case remanded for trial.

# ARGUMENT

## I.   This appeal is governed entirely by de novo review.

The district court's grant of summary judgment against Plaintiffs on their claims is reviewed *de novo*. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). Defendants were only entitled to summary judgment if they showed there was no genuine dispute of material fact and they were entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(a). If a reasonable jury could return a verdict for Plaintiffs, summary judgment was improper. *Tregre*, 997 F.3d at 281. In making that reasonable jury determination, all evidence must be viewed "in the light most favorable to" Plaintiffs and "all reasonable inferences" must be drawn in Plaintiffs' favor. *Id.* The district court wholly failed to apply these standards, leading it to improperly grant summary judgment for Defendants.

## II.  The district court erred in granting summary judgment on Plaintiffs' EPA and Title VII retaliation claims.

The EPA prohibits "any person" from retaliating against an employee for opposing employment practices that discriminate on the basis of gender. 29 U.S.C. § 215(a)(3). Title VII's antiretaliation provision also prohibits "an employer" from "discriminat[ing] against" an employee for "oppos[ing] any practice" made unlawful by Title VII or "ma[king] a

charge, testif[ying], assist[ing], or participat[ing] in" a Title VII proceeding. 42 U.S.C. § 2000e-3(a).

This Court utilizes the *McDonnell Douglas* framework to assess retaliation claims under either Act. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 618 (5th Cir. 2020). Under that framework, the plaintiff first establishes a prima facie retaliation case by showing: (1) participation in an activity protected by Title VII; (2) an adverse employment action; and (3) a causal connection between the protected activity and adverse action. *Badgerow*, 974 F.3d at 618.

The defendant must then provide a "legitimate, non-discriminatory reason" for the adverse action. *Id.* at 619. If the defendant does, the plaintiff must show evidence sufficient to raise a fact issue as to whether the proffered reason is pretextual. *Id.*

Muslow and Cunningham easily established a prima facie retaliation case.[81] And none of Defendants' proffered non-discriminatory reasons support summary judgment.

---

[81] The district court suggested that whether all Defendants qualified as "employers" was relevant to the EPA retaliation claims. ROA.14371-14372. But the EPA prohibits retaliation by "any person," not just an "employer." 29 U.S.C. § 215(a)(3); *Arias v. Raimondo*, 860 F.3d 1185, 1191-92 (9th Cir. 2017) ("Congress clearly means to extend

### A. Plaintiffs established prima facie retaliation based on Skinner's adverse employment actions immediately after they raised equal-pay concerns.

In retaliation cases, timing is everything. "If an adverse employment action occurs within close temporal proximity to protected activity known to the employer, a plaintiff will have met her burden to establish a prima facie case of retaliation." *Badgerow*, 974 F.3d at 619; *see Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) (same). There is no question that "close temporal proximity" exists here.

Just ***one business day*** after Plaintiffs raised gender-pay equity concerns to Skinner, he rescinded their employment contracts, stopping their transfer to the OGC. Further, after filing EEOC charges, Plaintiffs were terminated from their long-held positions with LSUHSC-NO. Either of these undisputed facts satisfies the minimal showing of a prima facie case.

*First*, Muslow's 2/15/19 email to Skinner qualifies as a protected activity because it questioned the fairness of LSU's pay decisions and

---

section 215(a)(3)'s reach beyond actual employers."); *Seong Song v. JFE Franchising, Inc.*, 394 F. Supp. 3d 748, 752 n.5 (S.D. Tex. 2019) (same). In any event, fact questions abound as to whether the individual Defendants are "employers." Section II.A.1, *infra*.

consequently asked for a salary review.[82] Skinner knew exactly what Muslow's email meant—"that there was a – potentially a pay disparity between males and females at [LSUHSC-NO]."[83]

Muslow's email—an internal complaint to LSU's chief legal officer that opposes a discriminatory practice—is protected activity. 42 U.S.C. § 2000e-3(a); *see also generally Rodriquez v. Wal-Mart Stores, Inc.*, 540 F. App'x 322, 328-29 (5th Cir. 2013). The district court called Plaintiffs' prima facie case "suspect," but nevertheless assumed: (1) Muslow's email "likely" fell under Title VII's opposition clause; and (2) Plaintiffs' belief they were being discriminated against was reasonable.[84] Muslow's email—which opposed gender pay discrimination—did not "likely" fall under the opposition clause; it definitely did. And contrary to the opinion below, the opposition clause does not require proof that opposed conduct actually violates Title VII to establish reasonableness. *Compare* ROA.14346, *with Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1210-11 (5th Cir. 2021) ("a plaintiff need not demonstrate that the practice was

---

[82] ROA.16947-16948.

[83] ROA.16696; *see also* ROA.16697, 16724-16725.

[84] ROA.14344-14346.

*actually* unlawful for his opposition to be a protected activity; rather, it is enough that the plaintiff *reasonably believed* the practice was unlawful").

Plaintiffs' later filing of EEOC charges is protected too, and independently establishes a prima facie case of retaliation. 42 U.S.C. § 2000e-3(a).[85] Defendants argued that Plaintiffs' EEOC charges were not reasonable or protected because Plaintiffs took an adverse position to their client (LSU).[86] Under that logic, no in-house counsel could ever file EEOC charges against an employer, an incredible proposition with no supporting precedent.

*Second*, there is no dispute that Muslow and Cunningham then suffered adverse employment actions (the second prima facie element). Their employment contracts were rescinded, their transfer to the OGC stopped, and they were eventually terminated from their long-held positions.

---

[85] The district court only found EEOC charges "likely fall[]" under Title VII's participation clause, but they indisputably do too. ROA.14347.

[86] ROA.9810-9811, 14347 n.234 (declining to address argument).

*Third*, there was no need for the district court to "assume" a causal connection (the third prima facie element)—that element was easily satisfied by a one-day immediacy between the adverse action (Skinner's rescission of employment contracts) and the protected activity (Muslow's email).[87] One day is more than "close enough" timing and is "highly indicative of" Skinner's retaliatory motive. *Garcia*, 938 F.3d at 243 (two months "close enough"); *Badgerow*, 974 F.3d at 620 ("The timing of Badgerow's firing is highly indicative of motive."); *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 578 (5th Cir. 2020) (periods from six weeks to two and one-half months show causal connection). Skinner conceded that Muslow's email caused him to set in motion the adverse actions:

> This email from Ms. Muslow was sort of, for me, the straw that broke the camel's back in terms of my comfort level.[88]

And just a few days *after* Plaintiffs filed EEOC charges, they received letters notifying them of their position terminations[89]—the first position

---

[87] ROA.14348.

[88] ROA.16701.

[89] ROA.9373, 10091.

"retirements" in the history of any LSU campus. So, if they wished to continue working for LSU, they now had to formally apply and compete for positions they had held for years.[90] That stands in stark contrast to Muslow's successor, who sought a pay raise and was not terminated, but instead got the raise via a new position specially created for him.

Beyond these two adverse actions, a third exists: Plaintiffs never received their requested pay increases. 42 U.S.C. § 2000e-2(a)(1); *Rubinstein v. Administrators of Tulane Educational Fund*, 218 F.3d 392, 402 (5th Cir. 2000) (upholding jury verdict that employer unlawfully retaliated by denying plaintiff's pay raise).

### B.   At minimum, fact issues exist as to whether Defendants' proffered non-discriminatory reasons are pretextual.

Defendants offered a handful of "non-discriminatory" reasons for rescinding Plaintiffs' employment contracts, refusing their pay increases, and ultimately terminating them. Those reasons fall into two categories: (1) Plaintiffs' failure to "timely" sign their OGC employment contracts, even though they were given no deadline by which to do so; and (2) events that occurred long *after* the adverse employment actions and are

---

[90] ROA.16718.

therefore irrelevant, including that Plaintiffs did not apply and compete for their jobs in late Spring 2019. There is no question that Plaintiffs "cast doubt" on these explanations, "enabling a reasonable factfinder to conclude that [they are] false" and precluding summary judgment. *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002); *Watkins*, 997 F.3d at 284 (plaintiff creates genuine fact dispute on pretext using any evidence that casts doubt on credence of proffered reason).

The contracts themselves contain no deadlines or expiration dates, and Plaintiffs were not given one. Instead, Plaintiffs were treated as part of the OGC team for *almost two months* before Skinner concocted the contract "expiration" excuse on February 18, just one business day after Muslow's pay-equity email. Skinner had already formally welcomed Plaintiffs to the OGC two months earlier, and Muslow had received work assignments. And with Defendants' knowledge, Plaintiffs continued to provide legal services long after mid-December 2018, when all such services were required to come through the OGC.

The artificial February 1, 2019 "effective date" of the contracts in no way indicates they expired.[91] Plaintiffs were asked to sign them

---

[91] ROA.16739, 16817-16818, 16850-16852.

almost two weeks later, on February 12, 2019.[92] Nothing in the email transmitting the contracts, or any other communication, specified a signing deadline, much less that the contracts would expire if not executed by a certain date (particularly the two weekend days between Muslow's pay-disparity email and Skinner's withdrawal of the contracts).

Beyond that, LSU's after-the-fact emphasis on the importance of signing the contracts cannot be squared with its later requests that Muslow consent to be treated as a candidate for the OGC position, even though she still had not signed her employment contract.[93] That is precisely the sort of inconsistent explanation for employment decisions that allows an inference of pretext. *Gee*, 289 F.3d at 347-48; *Burrell v. Dr. Pepper/Seven Up Bottling Grp., L.P.*, 482 F.3d 408, 412 n.11 (5th Cir. 2007); *Berry v. Parish*, 834 F. App'x 843, 848 (5th Cir. 2020) (reversing summary judgment on retaliation claim because timing of termination, shifting explanations, and plaintiff's potential disparate treatment created fact issues).

---

[92] ROA.16715, 16743.

[93] Those employment contracts did not include a position description as required for completion.

It was only and conspicuously *after* Muslow raised gender-pay disparity concerns that Skinner claimed those contracts "expired."[94] Everything about Plaintiffs' transition to the OGC was going smoothly until then. LSU's discredited "expiration" reasons combined with "the near-immediate temporal proximity" of the adverse action leaves "no room to doubt that [Plaintiffs have] carried [their] summary-judgment burden" here. *Watkins v. Tregre*, 997 F.3d 275, 285-86 (5th Cir. 2021).

The rest of the "non-discriminatory" reasons Defendants offered are irrelevant because they occurred *after* the retaliation. Those post-hoc reasons cannot support summary judgment as a matter of law. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 238 (5th Cir. 2015) ("We have already observed that, as a matter of law, a purported reason for a decision that postdates the actual decision is necessarily illegitimate.").

In any event, the "retirement" (rather than transition) of Plaintiffs' positions and their decision not to re-apply for their own long-held positions (with continued discriminatory pay) cannot support summary judgment. It was only *because* Plaintiffs voiced gender pay concerns that

---

[94] ROA.16723.

their contracts were rescinded and their transition to the OGC stopped, thus requiring them to re-apply. Those post-hoc justifications for the adverse employment actions, even if relevant, cannot support summary judgment. *See Watkins*, 997 F.3d at 285 (plaintiff raised fact issue on pretext where defendant had never fired employee for proffered "performance issue").

Because a reasonable factfinder could easily find that Defendants' proffered reasons were pretextual, summary judgment was improper and reversal is warranted on the retaliation claims.

## III. The district court erred in granting summary judgment on Plaintiffs' Equal Pay Act claims.

The Equal Pay Act ("EPA") proscribes pay inequities "between employees on the basis of sex by paying wages to employees … at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex … for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions[.]" 29 U.S.C. § 206(d)(1).

The *McDonnell Douglas* framework again governs EPA claims, but with a key difference: after the plaintiff establishes a prima facie case, *the burden shifts and stays with the defendant* to prove one of the EPA's

four enumerated affirmative defenses applies. *See*, *e.g.*, *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1136 (5th Cir. 1983). The district court misapplied this law in two ways: (1) finding Plaintiffs did not establish their prima facie case based on incorrect standards for determining both "employers" and "comparators," and then (2) improperly *shifting the burden back to* Plaintiffs to raise a fact issue on Defendants' affirmative defenses. Those errors warrant reversal.

## A.    Plaintiffs established a prima facie pay-discrimination case.

An EPA prima facie case exists when: (1) the defendant is an "employer"; (2) the plaintiff performed work in a position requiring equal skill, effort and responsibility under similar working conditions; and (3) the plaintiff was paid less than an employee of the opposite sex providing the basis of comparison. *Badgerow*, 974 F.3d at 617. Plaintiffs satisfied all three elements, including that they were paid *less* than male comparators for *more* work.

### 1.    LSU is indisputably an "employer," and the status of the other Defendants raises fact issues.

It is undisputed that LSU is Plaintiffs' employer. The only question is whether any of the individual Defendants also qualify as "employers"

38

such that Plaintiffs' EPA claims against them individually can be maintained. On that question, fact issues preclude summary judgment.

An employer is "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d). This Circuit's "employer" test looks at the "economic reality" of the relationship, including factors like whether the alleged employer can hire and fire, supervise, and set the employee's work schedule. *Gray v. Powers*, 673 F.3d 352, 354-55 (5th Cir. 2012); *Chapman v. A.S.U.I. Healthcare & Dev. Ctr.*, 562 F. App'x 182, 185 (5th Cir. 2014). "[E]ach element need not be present in every case," and "those who have operating control over employees within companies may be individually liable for FLSA violations committed by the companies." *Gray*, 673 F.3d at 357.

The "employer" question is rife with fact issues for the individual Defendants, who all pointed at each other. *Someone* terminated Plaintiffs' positions at LSUHSC (Hollier), *someone* stopped their transfer to the OGC after they raised pay-equity concerns (Skinner and Jones), and *someone* made decisions regarding their inequitable salaries for years (Hollier, Harman, and Skinner). The district court erred in finding

no one did as a matter of law. *See Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669 (5th Cir. 1968) ("Whether a person or corporation is an employer or joint employer is essentially a question of fact.").

**Hollier.** The district court found that Muslow "reported to Hollier,"[95] but still inexplicably held that Hollier was not her employer at any time.[96] There is no basis for that holding, particularly given that Hollier never disputed he was Muslow's employer through the end of 2018.[97]

Hollier cannot escape liability for the early part of 2019 by pointing fingers at Skinner. Skinner pointed right back at Hollier as the one who ultimately terminated Plaintiffs.[98] That finger-pointing does not relieve either of liability, but instead raises a fact issue as to Hollier's employer status.

Further, Hollier cannot avoid employer status as to Cunningham simply because Muslow acted as an intermediary between them. Muslow

---

[95] ROA.14315.

[96] ROA.14362-14363.

[97] ROA.10490-10495.

[98] ROA.10492.

did not fire Cunningham or underpay her. Hollier did. *He* (with Harman's help) made "carte blanche" pay decisions for individuals working in the Chancellor's Office. *He* decided that part-time employees like Cunningham (disproportionately women) could not receive equity pay adjustments. And *he* terminated Cunningham's position (after Skinner stopped her transition to the OGC). That at least raises fact issues as to Hollier's employer status over Cunningham. *See Chapman*, 562 F. App'x at 185 (economic reality test satisfied where individual hired plaintiffs, made pay decisions, and scheduled work); *Burton*, 798 F.3d at 227 (adequate evidence of employment relationship where entity could demand plaintiff's termination and supervised him); *Slabisak v. Univ. of Texas Health Sci. Ctr. at Tyler*, No. 4:17-CV-597, 2018 WL 4762121, at *2 n.1 (E.D. Tex. Oct. 2, 2018) (fact issues precluded summary judgment on employer status).

**Skinner.** Hollier pointed to Skinner as Muslow's and Cunningham's employer, testifying that "as of January 1st, [Plaintiffs] no longer worked for me. [They were] under the authority of Skinner."[99]

---

[99] ROA.16613-16614, 16653.

Skinner had the power to hire, fire, and control their work, particularly in early 2019 as they transitioned to the OGC.

Skinner admitted that Muslow's pay-equity email caused him to rescind Plaintiffs' contracts and stop their transition to the OGC (firing).[100] And Hollier said he terminated Plaintiffs' positions at Skinner's direction.[101] There is more than sufficient evidence to avoid summary judgment on Skinner's "employer" status.[102]

**Harman.** As vice chancellor of administration and finance, Harman exercised some approval authority over salary decisions at LSUHSC-NO.[103] Those inequitable pay decisions lie at the heart of the pay discrimination claims here. Harman also participated in drafting the termination letters sent to Plaintiffs after they filed EEOC charges.[104] Summary judgment for Harman on his employer status was also inappropriate.

---

[100] ROA.16847; *see also* ROA.16848 (organizational chart reflecting OGC reporting hierarchy); ROA.16675, 16701, 16723.

[101] ROA.16602 (Hollier Depo. 190:8-192:6); ROA.10492, 16613.

[102] ROA.16691.

[103] ROA.16578, 16581.

[104] ROA.13118-13120.

**Jones.** Trey Jones exercised control over Muslow and therefore Cunningham after January 1, 2019.[105] He participated in decisions about their OGC transition and the later drafting of their termination letters, which were sent after they filed EEOC charges.[106] Summary judgment was improper on his employer status too.

In sum, there is no question that LSU acted as Plaintiffs' employer, and fact issues preclude a matter-of-law determination on each individual Defendants' employer status.

> **2.     Plaintiffs established a prima facie EPA claim, including by showing that employees of the opposite sex were paid more for less work.**

The last two elements of a prima facie EPA discrimination claim consider whether the plaintiff performed work in a position requiring substantially similar skill, effort and responsibility under similar working conditions and whether the plaintiff was paid less than a comparable employee of the opposite sex—a "comparator." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *Badgerow*, 974 F.3d at 617.

---

[105] ROA.12638.

[106] ROA.16603, 16605, 16683, 16695; *see also* ROA.13118-13120.

The district court's "comparator" analysis misses the forest for the trees: in its search for an "identical" comparator (which is not required under this Circuit's precedent), it missed that a prima facie case can be established where a female is paid *less* money for *more* work.

The EPA's "equal work" test asks whether a job is "substantially identical or equal," but does not require "absolute identity[.]" *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir. 1973); *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006). And it turns on the actual job content and the actual skills and qualifications needed to perform it—not job descriptions or titles. *Riser v. QEP Energy*, 776 F.3d 1191, 1196 (10th Cir. 2015); *Beck-Wilson*, 441 F.3d at 363. At bottom, "[w]hat constitutes equal skill, equal effort, or equal responsibility cannot be precisely defined" and must consider the "broad remedial purpose of the law." 29 C.F.R. § 1620.14; *see also Corning Glass*, 417 U.S. at 208 (same).

That is precisely why the Code of Federal Regulations—which is entitled to great deference (*Brennan*, 479 F.2d at 239)—provides for not just an "equal" work pathway to liability, but also a "more work for less pay" pathway:

> It is necessary to scrutinize those inequalities in pay between employees of opposite sexes which may indicate a pattern of discrimination in wage payment that is based on sex. *Thus, a serious question would be raised where such an inequality, allegedly based on a difference in job content, is in fact one in which the employee occupying the job purportedly requiring the higher degree of skill, effort, or responsibility receives the lower wage rate.*

29 C.F.R. § 1620.13 (emphasis added).

> However, differences in skill, effort or responsibility which might be sufficient to justify a finding that two jobs are not equal within the meaning of the EPA if the greater skill, effort, or responsibility has been required of the higher paid sex, *do not justify such a finding where the greater skill, effort, or responsibility is required of the lower paid sex.*

29 C.F.R. § 1620.14 (emphasis added).

Under these provisions and case law interpreting them, an employer cannot escape EPA liability by claiming "unequal work" where a female employee has *more* education, skill, or responsibility than a higher-paid male. *Beck-Wilson*, 441 F.3d at 360 (agreeing with district court's rejection of argument that jobs were not substantially equal because plaintiffs' required *"greater* education and skill"); *Riser*, 776 F.3d at 1197 ("[T]he fact that a female employee has additional duties beyond a male comparator does not defeat the employee's prima facie case under the EPA"); *Ahad v. Bd. of Trustees of S. Ill. Univ.*, No.15-cv-03308, 2021

WL 6118239, at *5 (C.D. Ill. Dec. 27, 2021) (that plaintiff had additional responsibilities did not show unequal work because plaintiff was lower-paid employee).

That is precisely the situation here. Muslow and Cunningham showed they performed the same—and in fact *more*—work for less pay, establishing their prima facie EPA case.

LSUHSC-NO's Market Study establishes which employees occupy positions "requiring substantially similar skill, effort, and responsibility[.]" *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 591 (11th Cir. 1994). By creating "job families" and hierarchical paygrades, the Market Study grouped together jobs that "have many similarities in that they" "[r]equire similar knowledge, skills and abilities (competencies)[,]" "[p]ossess associated and related key behaviors[,]" and [h]ave similar market competitive pay characteristics and conditions."[107]

A court need not "make a comparison of two jobs" when, as here, the defendant has "already done so." *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571 (11th Cir. 1993). Section 1620.14 of the Code of Federal Regulations confirms this: "apparent differences between jobs

---

[107] ROA.12491, 16662.

[that] have not been recognized as relevant for wage purposes" will not "prevent the jobs from being equal in all significant respects under the law." CFR § 1620.14. Thus, an "employer's rating of jobs" is relevant to the EPA analysis, "especially where, as here, the rating came after an extensive study of comparative qualifications, degrees of responsibility, and chances of loss to the [employer]." *Brennan v. Victoria Bank & Tr. Co.*, 493 F.2d 896, 899 (5th Cir. 1974).

Guided by the Market Study, Plaintiffs each showed several male comparators in *lower paygrades* (meaning LSUHSC-NO concluded the positions required less skill, responsibility, etc.) made the same or more money than them. Numerous men within the Chancellor's Office with positions in *lower paygrades* earned substantially more than Muslow. *See* Statement of Facts, *infra*, pp. 12-13.[108] Muslow also showed her successor, Colletta, made more money than she did.[109]

Likewise, all three women in Cunningham's N37 paygrade were paid below the $162,242 midpoint,[110] while the salaries of the two N37

---

[108] ROA.9923, 9938, 10067.

[109] ROA.10166-10167.

[110] ROA.10064.

men exceeded the midpoint.[111] *See* Statement of Facts at p. 14, *supra*. LSUHSC-NO's own 2019 equity review could not explain such discrepancies among the men and women in N37 by length of service.[112] And Buhler (in a lower paygrade) had to seek legal advice from *Cunningham* to perform his job, but was paid more.[113] Such statistical evidence of gender-based pay disparity and individual comparator evidence supports Cunningham's prima facie case. *See Plemer*, 713 F.2d at 1137 ("An employee may use statistics to show that an employer's justification for a discriminatory act is pretext.").

The district court nevertheless held otherwise, ignoring the "equal" and "less for more" standards in the Federal Regulations and the inherent comparisons established by the Market Study. Instead, it relied on outdated, suspect position descriptions in order to find no "identical" comparator for either Plaintiff.

---

[111] ROA.9923-9924.

[112] ROA.12606-12607 ("HRM request a deeper review of the groups where significant T-test scores could not be explained by service time. These groups include: ... Overall grade N37 where female salaries are 87% of the overall average.").

[113] ROA.10139-10144, 16962.

The district court's opinion adopts an impossible-to-meet comparator standard for a senior female executive like a general counsel: if there is no *identical* position in an organization, there is no comparator and an EPA claim fails from the start. That sort of rigid view is precisely what courts have cautioned against—brushing the EPA's text "'with such a demanding gloss'" to suggest that a "prima facie case fails because [a plaintiff] has not identified 'one specific individual who constitutes a *perfect* male comparator.'" *Beck-Wilson*, 441 F.3d at 363 (quoting *Wheatley v. Wicomico County*, 390 F.3d 328, 334 (4th Cir. 2004)).

Plaintiffs showed substantially similar comparators, including ones who made more money for less work. And to the extent there is any dispute as to the duties of the comparators and whether those positions are substantially equal, that is a fact issue for the jury. *E.E.O.C. v. Hernando Bank, Inc.*, 724 F.2d 1188, 1197 (5th Cir. 1984) (reversing summary judgment on EPA claims because "[w]hether [defendant] paid different amounts to females than it paid for males for substantially equal job assignments is a disputed question of fact on the record before us"); *Beck-Wilson*, 441 F.3d at 363 ("Moreover, whether two positions are substantially equal for EPA purposes is a question of fact for the jury.");

*Fallon v. State of Ill.*, 882 F.2d 1206, 1208 (7th Cir. 1989) ("Whether two jobs require equal skill, effort, and responsibility, and are performed under similar working conditions is a factual determination.").

### B. The district court improperly placed the burden of proof on Plaintiffs, rather than requiring Defendants to explain the pay disparities.

Because Plaintiffs established their prima facie case, the burden should have shifted—***and stayed***—with Defendants to prove "beyond peradventure" that any pay disparities could be explained by factors other than sex. *Corning Glass*, 417 U.S. at 196-97; *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021). Although reciting the applicable law, the district court did not apply it. Instead, after finding Defendants "stated multiple valid defenses,"[114] the district court flipped the burden back to Plaintiffs to show pretext.[115] That pretext analysis has no place in the context of the EPA claims at issue.

The district court's erroneous burden-shifting relieved Defendants of their heavy burden to show—as a matter of law such that no rational

---

[114] ROA.14370.

[115] ROA.14371. The district court claimed this burden-flipping error was inconsequential on reconsideration. ROA.16024. It was not. Plaintiffs were not required to set forth *any* evidence of pretext to survive summary judgment on their EPA claims. *Beck-Wilson*, 441 F.3d at 365.

jury could find to the contrary—that the pay differential was justified under one of four enumerated affirmative defenses: "(i) a seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any factor other than sex." 29 U.S.C. § 206(d)(1); *Plemer*, 713 F.3d at 1136; *Beck-Wilson*, 441 F.3d at 365 (record must show "that [the defendant] established the defense so clearly that no rational jury could have found to the contrary"). Defendants did not make that matter-of-law showing, alone requiring reversal.

Even if the Market Study's paygrades are considered a gender-neutral system, that means nothing if the system is not methodically applied. *See Hodgson v. Brookhaven Gen. Hosp.*, 436 F.2d 719, 726 (5th Cir. 1970). Here, it was not. An easy example: Muslow's salary was set at the bottom of her paygrade instead of the top despite her 16+ years of experience. Obviously, a seniority system did not warrant Muslow's and Cunningham's lower pay. *See Thibodeaux-Woody v. Houston Comm. Coll.*, 593 F. App'x 280, 283 (5th Cir. 2014) ("a reasonable factfinder could reject [Defendant's] defense on the ground that it discriminatorily applied its [] policy"). In fact, Defendants' own testimony showed the

highly subjective nature of pay decisions at LSUHSC-NO, including supplemental benefits provided on a completely arbitrary basis.

Nor can (or did) Defendants prove as a matter of law any of the other enumerated EPA exceptions. During discovery in this lawsuit, Defendants suggested for the first time that Muslow had performance issues, but produced no contemporaneous documentation to validate that new-found excuse. It certainly was not proven as a matter of law. And no such allegations exist for Cunningham. Nor did Defendants even try to establish that salaries were measured by quantity or quality of production.

By improperly flipping the burden to Plaintiffs though, the district court let Defendants escape proving their affirmative defenses as a matter of law ("beyond peradventure"). *Guzman*, 18 F.4th at 160. That too warrants reversal on the EPA claims.

## IV.  The district court improperly granted summary judgment on the Title VII and Section 1983 discrimination claims.

For many of the same reasons that summary judgment was improper on the EPA discrimination claims, summary judgment should be reversed on the Title VII claim against LSU and corresponding § 1983 gender-discrimination claims against Harman and Hollier. *See*

*Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 166 (5th Cir. 2007) ("Section 1983 and title VII are 'parallel causes of action.'").

"To make out a *prima facie* case of discrimination in compensation, a plaintiff must show that he was a member of a protected class and that he was paid less than a non-member for work requiring substantially the same responsibility." *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 522 (5th Cir. 2008); *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) ("others similarly situated but outside the protected class were treated more favorably"). There is no dispute that Plaintiffs are members of a protected class and were paid less than non-members. The only dispute is whether those non-members are similarly situated—again a "comparator" analysis.[116]

Importantly, the "comparator" standard is more lenient under Title VII (similarly situated) than under the EPA (substantially identical). *Compare Siler-Khodr v. Univ. of Tex. Health Sci. Ctr.*, 261 F.3d 542, 546 (5th Cir. 2001) (EPA has "higher threshold), *with Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992) (Title VII uses

---

[116] ROA.14312.

"relaxed standard of similarity"). Nevertheless, the district court continued to impose an impossible "identical" standard while ignoring that LSUHSC-NO had already done the work of grouping its employees by similar job functions, responsibilities, and skills in the Market Study. The U.S. Supreme Court has rejected the district court's rigid comparator standard because it would mean that "a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay." *Washington Cnty. v. Gunther*, 452 U.S. 161, 179 (1981); *see also Reichhold Chemicals*, 988 F.2d at 1571 (Title VII was "designed to address" situation where "a woman is grossly underpaid but her job is not exactly comparable to a man's position").

The district court then went on to rely almost solely on proffered non-discriminatory reasons that ***postdated*** the discriminatory conduct to find no pretext as a matter of law. That too was error.

### A.   Title VII requires only similarly-situated comparators, but the district court still found that more lenient standard was not met.

Under Title VII, a plaintiff's "prima facie case is necessarily a flexible standard that must be adapted to the factual circumstances of the case." *Turner v. Kan City. S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012). Indeed, this Court has "previously considered disparate treatment of less similarly situated comparators as some evidence of pretext, even though it is less probative than evidence of a more similarly situated comparator." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 580 (5th Cir. 2020), as revised (Aug. 14, 2020); *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 950 (5th Cir. 2015) (considering evidence of differential treatment received by four employees despite no showing they were similarly-situated). Under those flexible standards, Plaintiffs established comparators sufficient to satisfy their prima facie case.

### 1.   Muslow established comparators.

LSUHSC-NO's 2017 Market Study is extremely important, if not dispositive. It represents LSU's own view of which employees share "similar knowledge, skills and abilities (competencies)" for purposes of

compensation.[117] That is precisely the "similarly situated" analysis required under Title VII. *See, e.g., Taylor*, 554 F.3d at 522; *Alvarado*, 492 F.3d at 611.

The chart below shows just a handful of Muslow's proffered comparators, all of whom were in the same Leadership job family and in *lower* pay grades than Muslow. They nevertheless made *more* money than Muslow, especially after Hollier's second round of pay raises in October 2018:[118]

| | **Pay Grade** | **Job Family** | **Supervisor** | **Salary** |
|---|---|---|---|---|
| Jimmy Cairo | N41 | Leadership | Hollier | $279,216 |
| Edwin Murray | N41 | Leadership | Hollier | $243,750 |
| Demetrius Porche | N42 | Leadership | Hollier | $266,940 |
| Katherine Muslow | N43 | Leadership | Hollier | $227,520 |

Murray had just two years of experience, but was nevertheless paid more than Muslow, with over fifteen years of experience.[119] Muslow's

---

[117] ROA.12491.

[118] ROA.9922-9941. The salaries in the chart reflect supplemental pay received, which factors into total compensation for Title VII purposes. ROA.4754-4759, 12520, 16750. They do not reflect car allowances. Muslow received no such additional pay.

[119] Importantly, experience or additional qualifications are part of a defendant's showing to avoid liability, not a plaintiff's prima facie showing. *See Beck-Wilson*, 441

position required an advanced degree (J.D.), while other positions (like Murray's) did not. Paying male executives at or above the market rate while paying a female far below her market rate is precisely the sort of evidence that establishes a prima facie case. *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 104 (2d. Cir. 2019).

Proffered comparators in higher paygrades further buttressed Muslow's prima facie showing. Three of those comparators, for example, were just one pay grade above Muslow, and yet made significantly more, especially after Hollier's second round of pay raises in 2018:[120]

|  | **Pay Grade** | **Job Family** | **Supervisor** | **Salary** |
|---|---|---|---|---|
| Henry Gremillion | N44 | Leadership | Hollier | $400,736 |
| Keith Schroth | N44 | Leadership | Hollier | $410,476 |
| Dean Smith | N44 | Leadership | Hollier | $338,130 |
| John Harman | N45 | Leadership | Hollier | $328,900 |
| Katherine Muslow | N43 | Leadership | Hollier | $227,520 |

---

F.3d at 362-63 ("Factors like education and experience are considered as a defense to an employer's liability rather than as part of a plaintiff's prima facie case.").

[120] ROA.9928, 16750. Again, these figures account for supplemental pay, but not car allowances.

Keith Schroth's position required no advanced degree.[121] And several were hired just a few years prior (like Smith in 2015 and Harman in 2017) and therefore had significantly less experience than Muslow.[122]

The district court committed a series of errors on its way to rejecting all of these individuals as comparators. *First*, it mischaracterized and essentially ignored the Market Study. *Second*, it hyper-focused on any apparent differences in each position's outdated, suspect description. *Third*, it rejected comparators who ostensibly made less than Muslow (but actually made more at certain times). And *fourth*, it rejected a well-established pathway to a prima facie case—a successor that received different treatment. Each error will be addressed in turn.

*First*, the Market Study answers the "comparator" question in LSUHSC-NO's eyes and for this Court. But the district court ignored the inherent comparisons established by the Study. Instead, it bizarrely stated that Muslow and Cunningham failed to "prove" the Market Study's paygrades were hierarchical, even though that structure is

---

[121] ROA.9795.

[122] ROA.9922-9931. These are not the only comparators offered, but even one suffices to establish a prima facie case. Muslow does not waive the other individuals named in summary judgment briefing as proper comparators.

apparent on its face. The pay grades ascended, as did the pay range for each pay grade.[123] LSU never argued otherwise, nor could it because its own HR director (the Study's author) testified to that hierarchical structure.[124] There is no legal or factual basis for ignoring the Market Study.

*Second*, the district court's requirement of an exact correlation in position descriptions (many of which were inaccurate, outdated, or otherwise suspect) cannot be squared with law permitting a flexible inquiry into comparator status. *See, e.g., Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (prima facie case "never intended to be rigid, mechanized, or ritualistic"); *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396-97 (6th Cir. 2008) (reversing dismissal of discrimination claims where district court required "exact correlation" between positions).

---

[123] ROA.10064.

[124] ROA.16662. The district court noted a few individuals in higher paygrades who seemingly made less than individuals in lower pay grades. ROA.14328-14329. That does not undermine the Study's hierarchical structure because the Study does not account for supplemental pay. Nelson (N47) did not make $311,739.96; he made $762,814, far more than Smith (N44). ROA.14328. Likewise, Porche (N42) earned $266,940, more than Fair's (N39) $240,000. ROA.14328. In any event, explaining any such differences fell squarely with Defendants, not Plaintiffs in their prima facie case. And finally, to the extent that LSU treated men like Plaintiffs, that would simply mean that the men have EPA claims too, not that Plaintiffs' claims are foreclosed.

Again, LSUHSC-NO did not treat any such perceived differences as significant for salary purposes, and neither should this Court. Each comparator in the charts above was in the same Leadership job family and reported to Hollier. Several were in *lower* paygrades, meaning that LSUHSC-NO considered their positions as having less "knowledge, skills and abilities."[125] Yet they made more money than Muslow.

In backwards fashion though, the district court emphasized these lower qualifications to discount such individuals as comparators. *See, e.g.*, ROA.14317 ("Muslow had to have a J.D. degree to perform her job, whereas Murray did not."); ROA.14322 ("[U]nlike Muslow's position, Schroth's does not require him to have a J.D. degree or give legal advice."). That is precisely the sort of backwards analysis the Supreme Court has rejected—permitting an employer to escape Title VII liability by "hir[ing] a woman for a unique position in the company" and then paying her less. *Washington Cnty. v. Gunther*, 452 U.S. 161, 179 (1981). That Muslow occupied the only General Counsel position at LSUHSC-NO does not preclude her from Title VII relief.

---

[125] ROA.12491.

*Third*, continuing its unduly rigid analytical trend, the district court immediately dismissed any proffered comparators that ostensibly made "less" than Muslow.[126] But each of those proffered comparators (except Buhler) actually earned *more* than Muslow until she received a raise to the minimum of her paygrade.[127] Those comparators should not have been automatically discounted and instead further reinforce Muslow's prima facie case. And under the district court's logic, defendants can escape liability for pay discrimination by paying a male just $1 less than a female in the exact same job, even if the male is far less experienced or qualified. This runs afoul of the Supreme Court's mandate against "interpretations of Title VII that deprive victims of discrimination of a remedy, without clear congressional mandate." *Washington Cnty.*, 452 U.S. at 178.

*Fourth*, the district court waved off evidence showing more favorable treatment for Muslow's successor, a well-established pathway to establish a prima facie case. Muslow showed that her successor

---

[126] ROA.14314.

[127] ROA.9922-9931, 9781 ($227,520-$402,711 salary range for Muslow's paygrade, but only increasing her salary to minimum); ROA.9922, 9927.

(Colletta) asked for and quickly received a higher salary than Muslow despite his lack of experience in an academic setting or healthcare. In fact, he was allowed to create a tailor-made position for himself as Chief of Staff, with a higher salary of $249,000 and a $15,000 car allowance.[128] Evidence showed the only difference between Muslow's position and this new one was the flavor of Colletta's dealings with LSUHSC-NO leadership, raising at minimum a fact issue as to their comparability.[129] Compare Colletta's treatment to Muslow's when she asked for a raise— her transfer to the OGC was stopped and she was terminated.

## 2.    Cunningham established comparators too.

The district court's analysis of Cunningham's proffered comparators was plagued with the same errors, leading it to ignore the Market Study and discount every comparator offered. When viewed through the proper analytical lens, Cunningham also established comparators sufficient for her prima facie case.

---

[128] ROA.10166-10167. LSU concluded Colletta had "significant influence related to the development of the new Chief of Staff position, including developing duties and responsibilities as well as setting the minimum qualifications." ROA.4741-4754, 12619, 16534.

[129] ROA.16539.

The district court recognized that Richard Buhler, a Senior Contracts Administration Officer, had to "'seek advice from LSUHSC legal counsel [Cunningham and Muslow] as appropriate and necessary'" to do his job.[130] Nevertheless, and even though Buhler was assigned to a *lower* pay grade than Cunningham (N35 as opposed to Cunningham's N37), he made $25,000 more than her.

Again though, the district court rejected him as a comparator by unduly focusing on differences in outdated job descriptions. The district court emphasized that Buhler's position required "limited tasks" and *did not require* a J.D. degree, while Cunningham had to provide legal representation for LSUHSC-NO (including litigation) and her position *did* require a J.D. degree.[131] So even though her position required *more* credentials, *more* responsibility, and *oversight of Buhler*, she was paid less than him. Just as that raises serious questions under the EPA, it certainly does in the Title VII context and at a minimum establishes a prima facie case.[132]

---

[130] ROA.10139-10144, 14331.

[131] ROA.14331-14332.

[132] ROA.9736 ("[I]n terms of a Venn diagram, a lot of [Buhler's] job would be a circle within my bigger circle.").

Nor does it matter that Buhler reported to the Dean of the School of Medicine and not directly to Hollier. *Hollier indisputably* approved significant Buhler's pay raises, negating any significance to this reporting distinction.[133]

The district court's flawed analysis continued with Frank Wasser. He was in the same pay grade as Cunningham (N37). Like Cunningham, his position required a J.D. degree.[134] And just as Wasser's role required that he ensure compliance with LSUHSC-NO legal policies, so too did Cunningham's position require that she assist with LSUHSC-NO policies and procedures and train staff on legal matters.[135] Any other position distinctions the district court mentioned reinforced that her position required *more* responsibilities and skill.[136] Of course though, Wasser made more than Cunningham. In fact, every male in Cunningham's N37

---

[133] ROA.16612.

[134] ROA.14333.

[135] ROA.14330, 14333.

[136] Wasser also did not meet the qualifications required for his position, but at Colletta's request, the job description was revised so that Wasser could be hired. ROA.4766. In this process, another female applicant who was qualified for the job was not even given consideration. ROA.4768.

paygrade made more than every female, something LSU could not explain.[137]

The district court nevertheless focused on the fact that Cunningham did not directly report to Hollier (even though her boss, Muslow, did). But Wasser did not either; he reported to Colletta (Muslow's successor) and later Lori Ferro who, in turn, reported to Hollier.[138] Again, those minor differences do not preclude Wasser's "similarly situated" status as a matter of law.

******************************

The district court's too-demanding standards cannot be squared with the remedial purposes of Title VII or this Court's prior case law. Plaintiffs established their prima facie Title VII wage discrimination case, shifting the burden to Defendants to offer legitimate, non-discriminatory reasons for their lower pay. Defendants cannot do so.

---

[137] ROA.12606-12607.

[138] ROA.4776, 12973, 16879.

### B.   Defendants' proffered nondiscriminatory reasons are irrelevant and cannot support summary judgment.

Because Plaintiffs established their *prima facie* case, Defendants had to come forward with a legitimate nondiscriminatory reason for their disparate pay. *Watkins*, 997 F.3d at 282; *Haire v. Board of Sup'rs of La. St. Univ. Agri. & Mech. College*, 719 F.3d 356, 364 (5th Cir. 2013).

But almost all of Defendants' proffered reasons ***post-date*** the discriminatory pay decisions and are therefore completely irrelevant. Any reason related to the "retirement" of Plaintiffs' positions and their alleged failure to apply for the OGC positions in 2019 has *nothing* to do with their unfair pay for years prior.[139] Those are not *legitimate* reasons for Plaintiffs' lower compensation as required to satisfy Defendants' burden.

The only potentially relevant non-discriminatory reasons Defendants offered for Muslow's lower pay were her alleged ineligibility for a car allowance and that additional raises were reserved for key personnel. As to Cunningham, Defendants pointed to her part-time status as justifying the lack of any increase in pay *ever*. Even if those

---

[139] ROA.14338.

reasons are "legitimate," Plaintiffs at least raised a fact issue as to their falsity. *Garcia*, 938 F.3d at 244.

Muslow's ineligibility for a car allowance because she did not have a "vice-chancellor" title is belied by Harman's own admission[140] and Hollier's later approval of such an allowance for her successor (Colletta), whom Hollier considered "at the same level as a vice chancellor."[141] That pick-and-choose treatment permits a reasonable factfinder to find pretext. And Muslow's alleged "ineligibility" for a car allowance does not explain her lower total compensation than male counterparts, regardless of any supplemental benefits.

Beyond that, Muslow was paid at the very bottom of her paygrade, despite having 15+ years of experience. Other male comparators with less experience, however, were paid much higher in their paygrades. This obviously discretionary and inconsistent application of the pay classification system at LSU could well lead a reasonable juror to

---

[140] ROA.6913; ROA.6333 ("In that position [Muslow] served as a Vice Chancellor, and reported to the Chancellor of the LSUHSC").

[141] ROA.10418, 10166; *see also* ROA.6913 (organizational chart showing Muslow at same level as vice-chancellors).

conclude that Defendants' proffered reason for the pay disparity unworthy of belief. *Riser*, 776 F.3d at 1200.

That is not all though. Defendants also offered changing explanations for the pay disparities Muslow suffered for years. Hollier suggested that Muslow had "performance" issues, for example. Yet LSU provided not one single contemporaneous document to corroborate this testimony—which creates an inference of falsity. *Burton*, 798 F.3d at 239 (failure to produce contemporaneous written documentation of any employee complaints, despite testimony that corporation abides by rigorous record-keeping policies, created inference that charges of employee complaints were false); *Haire*, 719 F.3d at 365 (finding sufficient evidence of pretext based on close timing of selection of male for promotion and "papering [of plaintiff's] files with disciplinary write-ups").

Indeed, after Skinner rescinded Muslow's employment contract ostensibly because it "expired," she continued to be considered an "A" list candidate for the general counsel job she was supposed to transition to as a matter of course. This sudden "performance issue" excuse raises an inference of pretext and itself defeats summary judgment. *Burton*, 798

F.3d at 236 ("Evidence of a sudden and unprecedented campaign to document Burton's deficiencies and thus justify a decision that had already been made, however, could raise an inference of pretext.").

Nor does a reasonable factfinder have to believe Hollier's excuse that the LSU President's office would not approve a 20% salary jump for Muslow.[142] Defendants produced no policy prohibiting pay adjustments of 20% or more, much less to remedy historic underpayment. The Market Study called for big adjustments if necessary to bring every employee's salary to the minimum of their pay grade.[143]

Finally, Defendants' only proffered excuse for Cunningham's lower pay and ineligibility for additional raises was her part-time status. But Title VII covers part-time employees, so an employer cannot insulate itself with a policy that disproportionately affects such workers (the majority of whom are women).[144]

---

[142] ROA.16590, 16593-16594.

[143] ROA.12496, 16648, 16654.

[144] ROA.16657. In addition, discrimination claims cannot be prospectively waived by operation of unilaterally-enacted employer policies. *See, e.g.*, *Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 605-06 (6th Cir. 2013); *Fontenot v. Safety Council of Sw. Louisiana*, 16-84, 2017 WL 2831248, at *7 (W.D. La. June 28, 2017).

Post-dated reasons, shifting explanations, and contrary evidence—all of this should have led to denial of summary judgment for Defendants on Plaintiffs' Title VII discrimination claims. The district court erred in holding otherwise.

## V.  Plaintiffs request reassignment on remand to ensure fair trial proceedings going forward.

The district court's summary judgment and reconsideration orders improperly discredited Plaintiffs' evidence and repeatedly expressed disdain for their claims. Plaintiffs request that on remand, this matter be reassigned to a different judge.

In determining whether reassignment is proper, this Court has applied two tests—one more lenient than the other. The more stringent test considers: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. The more lenient test looks at whether the judge's role 'might reasonably cause an

objective observer to question [the judge's] impartiality.'" *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 892-93 (5th Cir. 2021).

Under either test, reassignment on remand is warranted. Throughout the proceedings below, the district court expressed its undue skepticism of Plaintiffs' claims and evidence. For example, the district court conjectured about the reasonableness of Plaintiffs' belief of pay discrimination and unnecessarily called their prima facie retaliation case "suspect" even though it indisputably was not as explained in Section I.A, *supra*. Those slights continued in the order on Plaintiffs' motion for reconsideration, where the district court found, for example, no evidence that Plaintiffs were paid less for more work, despite Plaintiffs offering several such examples. *Compare* ROA.16016-16017, *with* Section II.A.2 and Section III.A, *supra*.

Likewise, the district court held the parties to different standards. As one example, the district court refused to consider Plaintiffs' surreply, chastising them for filing it too late despite no pending deadlines or trial date. Yet, the district court easily considered a defendant's late-filed response to Plaintiffs' Motion for Reconsideration. *Compare* ROA.16007 (allowing Defendant's untimely response), *with* ROA.16014 (rejecting

Plaintiffs' surreply because "courts must establish and enforce briefing schedules").[145]

The district court also denied every single motion to compel filed by Plaintiffs, while granting entirely or in part every motion to compel filed by Defendants. It compelled Plaintiffs to produce tax returns (not just W-2s), while denying reciprocal requests for the § 1983 Individual Defendants'. And the district court overturned a magistrate judge decision limiting the scope of disability-related discovery, thereby compelling Cunningham's former employer to turn over decade-old disability records that are statutorily protected and had no possible relevance to the case. The district court also ignored the absence of any legal authority or evidence in Defendants' briefing to find that Plaintiffs improperly attached the Market Study to their Amended Complaint. ROA.547-551, 554.[146]

---

[145] *See also* ROA.3688 (striking update to Plaintiffs' expert report, even though Defendants "have the ability and time to respond" because "deadlines are important and must be enforced").

[146] The district court imposed a $10,000 sanction against Plaintiffs for allegedly failing to return to LSU certain documents they obtained during their employment as LSUHSC-NO's in-house lawyers. Defendants later used that ruling to support an "after-acquired evidence" defense that has no merit on a number of grounds (like waiver and irrelevance), especially when Defendants themselves put all of the "privileged" documents in evidence for summary-judgment purposes.

These are just a few examples that would lead an objective observer to question the district court's impartiality. Plaintiffs appreciate the gravity of their request, but nevertheless respectfully ask this Court to reassign this matter on remand.

## **CONCLUSION**

Appellants Katherine Muslow and Meredith Cunningham respectfully request that the Court reverse the district court's grant of summary judgment on their claims, remand for further proceedings, and reassign this matter. Plaintiffs request all further relief to which they may be justly entitled.

DATED: December 15, 2022    Respectfully submitted,

/s/ *Kelli Benham Bills*
Anne McGowan Johnson
Texas Bar No. 00794271
ajohnson@tillotsonlaw.com
Kelli Benham Bills
Texas Bar No. 24067169
kbills@tillotsonlaw.com
**TILLOTSON JOHNSON & PATTON**
1807 Ross Ave., Suite 325
Dallas, Texas 75201
(214) 382-3041 Telephone
(214) 292-6564 Facsimile

Counsel for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document is being served on all counsel of record herein on December 15, 2022 by the Court's ECF system.


/s/ *Kelli Benham Bills*
Kelli Benham Bills

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 5th Cir. R. 32.2 because this brief contains 12,770 words, excluding the parts of this brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.  This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) and 5th Cir. R. 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-Point Century Schoolbook font, with footnotes in 12-point font.

/s/ *Kelli Benham Bills*
Kelli Benham Bills