No. 22-30585

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**Katherine Muslow; Meredith Cunningham,**
*Plaintiffs-Appellants,*

v.

**Louisiana State University and Agricultural and Mechanical College, Board of Supervisors; Thomas Skinner, in his individual capacity; Larry Hollier; John Harman; Carlton Jones III, also known as Trey Jones,**
*Defendants-Appellees.*

---

On Appeal from the U.S. District Court for the
Eastern District of Louisiana
(No. 2:19-cv-11793-BWA-DPC)

---

## PLAINTIFFS-APPELLANTS' COMBINED REPLY BRIEF

---

Anne McGowan Johnson
Kelli Benham Bills
**TILLOTSON JOHNSON & PATTON**
1807 Ross Ave., Suite 325
Dallas, Texas 75201
214.382.3041 Telephone
214.292.6564 Facsimile
ajohnson@tillotsonlaw.com
kbills@tillotsonlaw.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................ii

TABLE OF AUTHORITIES ....................................................................iv

SUMMARY OF ARGUMENT ................................................................. 1

ARGUMENT ............................................................................................3

I.     Reversal is warranted on Plaintiffs' retaliation claims because Defendants have no answer to the prima facie case or to the multiple fact issues on pretext. ........................................................3

    A.     Defendants concede prima facie retaliation by ignoring two of Plaintiffs' three independent retaliation pathways........................................................................................4

        1.     *The first pathway*: Skinner's rescission of Plaintiffs' transfer to the OGC ......................................5

        2.     *The second pathway*: Plaintiffs' termination after filing EEOC charges ........................................6

        3.     *The third pathway*: Plaintiffs were denied requested raises ...........................................................11

    B.     LSU offers only one pre-retaliation reason for its conduct, and it is rife with fact issues...................................12

II.    Reversal is warranted on Plaintiffs' EPA discrimination claims because Defendants ignore Plaintiffs' more-for-less-pay pathway and did not prove any affirmative defense. .....................16

    A.     LSU ignores that EPA liability exists because Plaintiffs received less pay for jobs requiring greater skill and responsibility. ........................................................................17

    B.     Plaintiffs also offered comparators for whom at least a fact question exists as to "equal work" status. .....................21

    C.     Defendants evaded their burden to prove an EPA affirmative defense as a matter of law.................................25

III.  Reversal is warranted on Plaintiffs' Title VII and Section 1983 discrimination claims because comparators exist, and Defendants offer only non-relevant or fact-intensive reasons for their conduct. ............................................................. 30

    A.  Plaintiffs established comparators under Title VII's lenient standard, which Defendants cannot dispute ........... 31

    B.  Defendants continue to rely on irrelevant and fact-intensive nondiscriminatory reasons for their conduct, raising pretext and precluding summary judgment. .......... 35

IV.  Defendants' other arguments do not entitle them to summary judgment ............................................................................ 39

    A.  Defendants' procedural red-herring arguments are meritless. ............................................................................ 40

    B.  Fact issues preclude summary judgment for the individual Defendants on the EPA claims. ........................... 42

    C.  Plaintiffs' EPA claims against Skinner are not a remedial redundancy. ........................................................ 51

    D.  Harman and Hollier cannot hide behind qualified immunity. .......................................................................... 53

    E.  LSU's after-acquired evidence defense does not avoid remand. .............................................................................. 56

V.  Defendants offer no compelling reason to avoid reassignment. .... 57

CONCLUSION .......................................................................... 59

CERTIFICATE OF SERVICE................................................... 61

CERTIFICATE OF COMPLIANCE ......................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arias v. Raimondo,*
  860 F.3d 1185 (9th Cir. 2017)................................................................ 42

*Badgerow v. REJ Props., Inc.,*
  974 F.3d 610 (5th Cir. 2020)....................................................... 5, 12, 35

*Beck-Wilson v. Principi,*
  441 F.3d 353 (6th Cir. 2006)......................................................... 24, 30

*Benes v. City of Dallas,*
  No. 3:13-CV-663-N, 2014 WL 11515733, at *6 (N.D. Tex. July 28,
  2014) ........................................................................................................ 10

*Brennan v. Victoria Bank & Tr. Co.,*
  493 F.2d 896 (5th Cir. 1974)................................................................. 20

*Burton v. Freescale Semiconductor, Inc.,*
  798 F.3d 222 (5th Cir. 2015).................................................................. 28

*Chapman v. A.S.U.I. Healthcare & Dev. Ctr.,*
  562 F. App'x 182 (5th Cir. 2014) ......................................................... 47

*Connecticut v. Teal,*
  457 U.S. 440 (1982)................................................................................ 32

*Corning Glass Works v. Brennan,*
  417 U.S. 188 (1974)......................................................................... 24, 25

*Davis v. Scherer,*
  468 U.S. 183 (1984)................................................................................ 54

*Diaz v. Kraft Foods Glob., Inc.,*
  653 F.3d 582 (7th Cir. 2011)................................................................. 32

*Douglas v. DynMcDermott Petroleum Operations Co.,*
  144 F.3d 364 (5th Cir. 1998).......................................................... 9, 10

*E.E.O.C. v. Reichhold Chemicals, Inc.*,
  988 F.2d 1564 (11th Cir. 1993) .................................................. 20, 34

*Foley v. Univ. of Hous. Sys.*,
  355 F.3d 333 (5th Cir. 2003) .............................................................. 55

*Furnco Const. Corp. v. Waters*,
  438 U.S. 567 (1978) ............................................................................ 33

*Gagne v. City of Galveston*,
  805 F.2d 558 (5th Cir. 1986) .............................................................. 54

*Gee v. Principi*,
  289 F.3d 342 (5th Cir. 2002) .............................................................. 16

*Gray v. Powers*,
  673 F.3d 352 (5th Cir. 2012) .............................................................. 47

*Heath v. Bd. of Supervisors of S. Univ. & Agri. & Mech. College*,
  850 F.3d 731 (5th Cir. 2017) .............................................................. 32

*Johnson v. Louisiana*,
  351 F.3d 616 (5th Cir. 2003) .............................................................. 33

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991) .............................................................................. 42

*Kaplan v. City of Arlington*,
  184 F. Supp. 2d 553, 555 (N.D. Tex. 2002) ...................................... 10

*King v. Univ. Healthcare Sys., L.C.*,
  645 F.3d 713 (5th Cir. 2011) .............................................................. 25

*Lenzi v. Systemax, Inc.*,
  944 F.3d 97 (2d Cir. 2019) ................................................................. 31

*Mason v. Lafayette City-Parish Consol. Gov't*,
  806 F.3d 268 (5th Cir. 2015) .............................................................. 55

*Merrill v. S. Methodist Univ.*,
  806 F.2d 600 (5th Cir. 1986) .............................................................. 33

*Miller v. Sam Houston State Univ.*,
    986 F.3d 880 (5th Cir. 2021)............................................................57

*Piatt v. City of Austin*,
    378 F. App'x 466 (5th Cir. 2010) ...................................................55

*Pierce v. Smith*,
    117 F.3d 866 (5th Cir. 1997).............................................................53

*Plemer v. Parsons-Gilbane*,
    713 F.2d 1127 (5th Cir. 1983) .........................................................30

*Reich v. Circle C. Invs.*,
    998 F.2d 324 (5th Cir. 1993).............................................................52

*Riser v. QEP Energy*,
    776 F.3d 1191 (10th Cir. 2015).......................................................34

*Sellers By & Through Sellers v. Baer*,
    28 F.3d 895 (8th Cir. 1994)..............................................................54

*Seong Song v. JFE Franchising, Inc.*,
    394 F. Supp. 3d 748 (S.D. Tex. 2019) ...........................................42

*Stramaski v. Lawley*,
    44 F.4th 318 (5th Cir. 2022) ...........................................................43

*Suter v. Univ. of Tex. at San Antonio*,
    495 F. App'x 506 (5th Cir. 2012) .............................................51, 52

*Thibodeaux-Woody v. Houston Comm. Coll.*,
    593 F. App'x 280 (5th Cir. 2014) ....................................................29

*Traylor v. S. Components, Inc.*,
    No. 18-CV-0775, 2019 WL 3526358 (W.D. La. Aug. 1, 2019)............52

*Trevino v. United Parcel Serv.*,
    No. 3:08-CV-0889-B, 2009 WL 3199185 (N.D. Tex. Oct. 5, 2009)......52

*U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
    508 U.S. 439 (1993) .........................................................................42

*U.S. Postal Serv. Bd. of Governors v. Aikens,*
    460 U.S. 711 (1983) ................................................................ 33

*Washington Cnty. v. Gunther,*
    452 U.S. 161 (1981) ................................................................ 34

*Wooley v. City of Baton Rouge,*
    211 F.3d 913 (5th Cir. 2000) ........................................ 54, 55

## STATUTES

29 U.S.C. § 203 .................................................................... 43

29 U.S.C. § 206 ........................................................ 30, 43, 55

29 U.S.C. § 215 ............................................................ 42, 55

42 U.S.C. § 2000e-3(a) .......................................... 5, 10, 55

## OTHER AUTHORITIES

29 C.F.R. § 1620.13 ............................................................ 17

29 C.F.R. § 1620.14 ...................................................... 17, 20

## SUMMARY OF ARGUMENT

Defendants leave LSU with the rowing oar of grappling with the merits of Plaintiffs' retaliation and discrimination claims. On retaliation, LSU essentially concedes, as it must, that Plaintiffs established a prima facie case via at least two independent pathways: (1) Skinner's immediate rescission of Plaintiffs' transfer to the OGC after receiving Muslow's pay-equity email; and (2) Plaintiffs' failure to receive raises. On discrimination, LSU attacks the very Market Study it created by misrepresenting the Study's scope and depth, in direct conflict with the Study's language and the testimony of its creator. LSU's Market Study alone establishes "comparators" sufficient for both EPA and Title VII prima facie liability.

That leaves LSU to defend summary judgment with irrelevant and fact-ridden reasons for Defendants' conduct. It simply does not matter, for example, what Plaintiffs did *after* Defendants retaliated and discriminated against them. And a jury could easily disbelieve every single proffered excuse for Defendants' conduct based on Defendants' admissions alone, and further bolstered by the countervailing evidence and inferences in Plaintiffs' favor.

1

The individual Defendants' response briefs add very little regarding the merits of Plaintiffs' claims. Instead, they focus almost entirely on whether each individual qualifies as an "employer" for EPA liability. On that question, fact issues also abound, as exemplified by Defendants' finger-pointing at each other. The rest of the arguments in the Responses cannot prevent remand either. For example, LSU admits its after-acquired evidence defense does not do so (and that defense has dubious application here in any event). And qualified immunity cannot shield Harman and Hollier for conduct that violates clearly-established law protecting employees from gender-based discriminatory and retaliatory conduct.

Plaintiffs therefore respectfully request reversal on all of their claims and reassignment to a new judge on remand.

## **ARGUMENT**

**I.    Reversal is warranted on Plaintiffs' retaliation claims because Defendants have no answer to the prima facie case or to the multiple fact issues on pretext.**

LSU buries its response to Plaintiffs' retaliation claims at the back of its brief. Perhaps that is because Defendants essentially concede prima facie retaliation exists here (which the district court also presumed). Indeed, Skinner *admitted* that he rescinded Plaintiffs' transfer to the OGC *because* he received Muslow's pay-equity email.[1] This Court can therefore skip directly to pretext (Section I.B), although Plaintiffs also address LSU's attacks on the EEOC charge pathway to liability in Section I.A.

That leaves LSU to try to obtain affirmance at the pretext stage, but it cannot by relying on irrelevant and fact-intensive reasons for Defendants' conduct. LSU's nebulous waiver argument does not help it either (LSU Resp. 44)—LSU identifies nothing in particular it says was waived, likely because Plaintiffs raised the same retaliation theories

---

[1] *E.g.*, ROA.16701 (describing email as "the straw that broke the camel's back"); ROA.16695 ("it was my decision to retract those letters *because* I was so taken aback by Ms. Muslow's e-mail").

below that they now urge on appeal.[2] Reversal and remand on the EPA and Title VII retaliation claims is warranted.

### A. Defendants concede prima facie retaliation by ignoring two of Plaintiffs' three independent retaliation pathways.

Plaintiffs provided three independent pathways to prima facie retaliation: (1) Skinner's next-business-day rescission of Plaintiffs' transfer to the OGC because of Muslow's 2/15/19 pay-equity email; (2) Plaintiffs' receipt of official termination letters immediately after filing EEOC charges (which Defendants knew about); and (3) denial of Plaintiffs' requested pay raises. (Op. Br. 29-33.) LSU focuses almost entirely on (2), with a one-sentence conclusory statement on (1) and not a word on (3). Likewise, Skinner—the key actor whose conduct is at the heart of the first pathway—*omits any discussion* of those events in his argument section, while Hollier and Harman just say "it wasn't me." (Skinner Resp. 20-27; Hollier Resp. 22; Harman Resp. 7, 12.)

Evidence of any one pathway shifted the burden to Defendants to provide non-discriminatory reasons for their conduct; here, Plaintiffs

---

[2] *E.g.*, ROA.11872-73, 11832-34, 12372-73; *see also* ROA.11816.

showed all three. 42 U.S.C. § 2000e-3(a); *see Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 619 (5th Cir. 2020).

### 1. *The first pathway*: Skinner's rescission of Plaintiffs' transfer to the OGC

Like the district court, LSU apparently "assume[s]" Plaintiffs showed prima facie retaliation based on Skinner's rescission of Plaintiffs' transfer to the OGC. (LSU Resp. 46.) Nevertheless, in one sentence, LSU regurgitates the district court's unjustified characterization of Muslow's pay-disparity email as "suspect" and questions the reasonableness of Plaintiffs' belief of gender-pay inequities at LSUHSC-NO. (LSU Resp. 46).

But LSU has never disputed Muslow's email or Skinner's response; indeed, it cites both. (LSU Resp. 10-11.) Nor can LSU hide from Skinner's frank admissions that: (1) he understood Muslow's email raised Plaintiffs' concerns of gender-based wage differences at LSUHSC-NO; and (2) he stopped Plaintiffs' transition to the OGC because of that email.[3] (Skinner Resp. 6.) Skinner's admissions easily establish a causal

---

[3] Skinner was LSU's General Counsel and Vice President at the time, with ultimate responsibility over Title IX for the entire LSU system. (Skinner Resp. 4); ROA.12652-53 ("[T]he Office of General Counsel's direct supervision of [the Title IX coordinator]

link for prima facie retaliation purposes. (LSU Resp. 11; Skinner Resp. 6.)

That leaves LSU with half a sentence that the district court's reasonableness analysis is "factually and legally supported," while not responding at all to the problems Plaintiffs identified with that analysis. (*Compare* LSU Resp. 46 *with* Op. Br. 30-31.) Under Fifth Circuit law, which does not require proof of claims to establish reasonableness, Plaintiffs' belief that gender-based pay disparities occurred at LSUHSC-NO was inherently reasonable—it was supported not only by the Market Study, but also the additional perks received by numerous men, but not a single woman, in the Chancellor's office.[4] (Op. Br. 30-31.)

This pathway alone shifted the burden to Defendants to prove non-discriminatory reasons for their conduct.

### 2. *The second pathway*: Plaintiffs' termination after filing EEOC charges

With no real answer to the first pathway, LSU tries to undermine the second: that Plaintiffs received letters officially terminating their

---

presented conflict of interest concerns, a fact that has been recognized repeatedly by the University but never addressed.").

[4] *See also* Op. Br. 9; ROA.9914-9941, 12520, 16659.

positions (adverse employment action) just days (casual connection) after they filed EEOC charges (protected activity). LSU makes two meritless points: (1) that Plaintiffs knew about the retirement of their positions *before* they filed the charges (a point Hollier parrots); and (2) the charges were not protected activity because Plaintiffs had to take a position adverse to LSU. (LSU Resp. 45-46, 50-53; Hollier Resp. 23-24.)

On the first point, LSU and Hollier confuse alleged knowledge of plans to *transfer or consolidate* Plaintiffs' legal positions to the OGC with Plaintiffs' *termination*. Plaintiffs were not informed of the latter until *after* Plaintiffs filed EEOC charges. Before then, Hollier told Plaintiffs he knew of no plans to eliminate any position.[5] And while Hollier said in an early March email (*after* Muslow's pay-equity email and Skinner's retaliation) that Plaintiffs' LSUHSC-NO positions would be retired—the first "position retirements" in organization history—his email did not unequivocally communicate Plaintiffs' termination.[6] It only created confusion, as Plaintiffs had already been formally welcomed into the

---

[5] ROA.16968.

[6] ROA.6878-80, 16730.

OGC and their "transfer" was a simple change in reporting structure.[7] That is why Muslow followed-up on Hollier's email to ask for confirmation of Plaintiffs' transition to the OGC.[8]

The next correspondence Plaintiffs received were the termination letters, which were dated March 25 but mailed on March 29, after Plaintiffs filed EEOC charges and after they (and the EEOC) informed Defendants of that fact.[9] Fact questions about when the letters were drafted and sent only further confirm why summary judgment was inappropriate.[10] Instead of sworn testimony about when he signed the letters, Hollier merely points to the date on the letterhead and speculates the letters "could have been delayed in the mailroom." (Hollier Resp. 16,

---

[7] ROA.16555 ("the attorneys would remain physically in New Orleans but they would report now to Tom Skinner and his group as opposed to directly to the chancellor"); ROA.6845 ("Effective January 1, 2019 the legal staff housed at the Health Science Center in New Orleans and Shreveport, and the Health Care Services Division *will report* to the LSU Office of the General Counsel. . .. The legal staff at each institution *should be transferred to the LSU HR/Payroll system*" and specifically including "Katherine Muslow" and "Meredith Cummingham [sic]" (emphases added)); ROA.16847 ("We *will transition you to OGC administratively* sometime after January 1, . . .. (emphasis added)); ROA.6847 ("we will be transferring the existing staff" and this was "an agency transfer").

[8] ROA.6878, 16729-30.

[9] ROA.9373, 10091, 16751-57, 16880-81, 16890-91.

[10] ROA.16604-05.

24-25.) Such speculation does not negate Plaintiffs' showing of a causal link between the EEOC charges and the official termination notices.

LSU's second point fails too because Plaintiffs' EEOC charges are quintessential Title VII protection-clause activity. (LSU Resp. 50; *see also* Hollier Resp. 23 ("Hollier does not dispute that the filing [*sic*] an EEOC Charge alone would constitute protected activity recognized under the law.").) LSU admits lawyers do not lose their civil rights by going in-house, but nevertheless urges the opposite result for Plaintiffs. (LSU Resp. 51.) LSU cites no authority that Plaintiffs, simply by becoming in-house counsel, lost the right to file EEOC charges or the protection of federal retaliation laws. *Douglas* certainly does not, as there, an in-house lawyer informally disclosed client confidences to a third-party (not the EEOC), told the third-party not to treat that disclosure as a whistle-blower complaint, and was "not attempting to establish a 'claim or defense' on her behalf" against her client. *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372-73 (5th Cir. 1998). None of that is true here.

Nor can LSU use Plaintiffs' purported submission of documents to the EEOC in support of their charges to remove those filings from

protection. "The participation clause affords protection under Title VII by prohibiting retaliation for assistance and participation *in any manner* 'in an investigation, proceeding, or hearing" under the statute. *Id.* at 373 (quoting 42 U.S.C. § 2000e-3(a).) Plaintiffs' providing of documents to assist the EEOC's investigation of those charges fall within the participation clause's broad protection. 42 U.S.C. § 2000e-3(a). None of LSU's cited cases say otherwise. (LSU Resp. Br. 51-53 (citing *Douglas*, 144 F.3d at 373, *Kaplan v. City of Arlington*, 184 F. Supp. 2d 553, 555 (N.D. Tex. 2002) (filing dozen hostile and defamatory grievances and refusing to participate in investigation of those grievances left activity unprotected under *opposition* clause), and *Benes v. City of Dallas*, No. 3:13-CV-663-N, 2014 WL 11515733, at *6 (N.D. Tex. July 28, 2014) (filing dozens of grievances, making false reports, and interfering with defendant's ability to conduct business meant activity unprotected under *opposition* clause).)

The other purported "unprotected conduct" LSU raises occurred *after* Plaintiffs filed their charges and suffered retaliation.[11] (LSU Resp.

---

[11] LSU complains about Plaintiffs' emailing of documents to themselves, including in 2018, but Muslow testified that doing so was "common practice" to allow them to work from home as necessary to fulfill their job responsibilities. ROA.10387. LSU has not

52-53.) Tellingly, LSU cites no case that later conduct can *retroactively* invalidate Plaintiffs' protected conduct—*i.e.*, Plaintiffs' EEOC charges (not to mention Muslow's 2/15/19 pay-equity email). (LSU Resp. 52-53). Plaintiffs' EEOC charges constitute a second, independent pathway to retaliation liability.

### 3.  *The third pathway*: Plaintiffs were denied requested raises

Not one of the five separate Response briefs mentions this pathway to a prima facie retaliation claim, raised below and in Plaintiffs' Opening Brief. (Op. Br. 33; ROA.13215 (citing law on denial of pay increase as actionable retaliation); ROA.13281 (Cunningham's "salary review request was ignored, her contract was withdrawn without explanation or discussion by Skinner and Jones, and she was fired.").) This third, unanswered pathway precluded summary judgment too.

* * * * * * * * * * *

Defendants conceded two prima facie pathways and cannot show Plaintiffs' EEOC charges were unprotected activity, shifting the burden

---

produced a policy on this practice, nor identified discipline against other employees for it.

to Defendants to offer *legitimate*, non-retaliatory reasons for their conduct. Defendants instead rely on irrelevant and fact-ridden ones.

## B. LSU offers only one pre-retaliation reason for its conduct, and it is rife with fact issues.

LSU does not dispute that a non-retaliatory reason occurring *after* the retaliatory conduct is irrelevant. (Op. Br. 36.) Yet, *all but one reason* LSU identifies in its Response post-date not only Skinner's rescission of Plaintiffs' transfer to the OGC, but also Hollier's official letters notifying them of their termination. (LSU Resp. 46-47.) It simply does not matter what Plaintiffs did *after* the retaliation, as their post-retaliation conduct cannot validate Defendants' prior adverse employment actions. Because such post-retaliation reasons are not legitimate as a matter of law, Plaintiffs had no burden to rebut them and waived nothing. (Op. Br. 36.) LSU's claim of waiver therefore falls flat; one cannot waive an obligation one never had. (LSU Resp. 47); *Badgerow*, 974 F.3d at 618 (defendant must provide "***legitimate***, non-discriminatory reason" (emphasis added)).

That leaves LSU with just one potentially viable non-retaliatory reason for the adverse employment actions here—that Plaintiffs did not execute their OGC employment contracts by February 1, 2019. (LSU

Resp. 46.) Plaintiffs fully addressed that reason below.[12] But the district court ignored the multiple fact issues arising from LSU's thin "no-execution-of-OGC-contracts" reason, and LSU does the same in its Response.

All parties agree, for example, that Plaintiffs were asked to sign the OGC contracts long *after* the contracts' alleged effective date. If the February 1 effective date was really an expiration date as LSU now claims, why would Plaintiffs be asked to sign contracts that, according to LSU, had already expired?[13]

The obvious answer, and one a jury could easily agree with, is that the effective date (and even each contract itself) was inconsequential. After all, this was simply an "agency transfer," a change in reporting structure that "really should not affect [Plaintiffs'] day to day work."[14] That explains why Skinner formally welcomed Plaintiffs to the OGC

---

[12] *E.g.*, ROA.13282 ("Ms. Cunningham was never given a date by which she had to sign the presented employment contract."); ROA.12373 ("Ms. Muslow was never given a date by which she had to sign the presented employment contract.").

[13] ROA.16715,16740-43.

[14] ROA.16847-48, 16555.

team long before the contracts' effective date.[15] Defendants never told Plaintiffs they had to sign the contracts (which contained discriminatory salaries) by a certain date (particularly by the Saturday or Sunday between Muslow's pay-equity email and Skinner's response), or their transfer to the OGC would be rescinded. Defendants cannot point to *any* evidence that anyone considered or treated the contracts' effective date as a drop-dead expiration date that had to be met—until, of course, *after* Muslow sent the 2/15/19 pay-equity email.[16]

And of course, the jury could also simply take Skinner at his word— that he rescinded Plaintiffs' transfer to the OGC because of Muslow's pay-equity email.[17] He (and LSU) cannot escape the import of this stark admission with any purported claim of "shock" at Plaintiffs' salary review request. (Skinner Resp. 11.) A jury could reject that excuse because Skinner had access to the Market Study and could quickly ascertain that

---

[15] ROA.16847.

[16] ROA.16883.

[17] ROA.16701 (describing email as "the straw that broke the camel's back"); ROA.16695 ("it was my decision to retract those letters *because* I was so taken aback by Ms. Muslow's e-mail").

Plaintiffs' requests were perfectly in line with what LSUHSC-NO said their salaries should be based on their pay grades and experience.[18]

A jury could also conclude that the disparate treatment of Muslow's successor (Colletta) confirms retaliation here. Jones admitted he hired Colletta to fill the position Muslow was meant to occupy at the OGC. (Jones Resp. 14; *see also* Skinner Resp. 11; Hollier Resp. 16.) But when Colletta sought a raise, he was not immediately terminated like Plaintiffs. Instead, he received one.[19] That disparate treatment alone could cause a jury to find pretext. And that Colletta was later allowed to

---

[18] ROA.9914-9941, 10064. LSU and Skinner point to Baton Rouge HRM's recommended salary for the OGC chief counsel position. (LSU Resp. 10; Skinner Resp. 9.) The Baton Rouge number clearly conflicts with the salary range for Muslow's position established by LSUHSC-NO's comprehensive Market Study. ROA.10064. And no Baton Rouge number was provided for Cunningham. In any event, Harman testified that the OGC consolidation did not impact Plaintiffs' positions in any significant way; it only changed their reporting structure. ROA.16555; *see also* ROA.6851 (Skinner email informing Muslow "we **will transition** you to the OGC **administratively**" (emphasis added)); ROA.16843 (evidence of Plaintiffs' salaries still coming from OGC budget after transfer); ROA.16846 (same). That too indicates the continued relevancy of the Market Study numbers after Plaintiffs' OGC transfer. The bigger point though is that Defendants cannot avoid fact issues on pretext with flip-flopping explanations that Plaintiffs first allegedly failed to sign the employment contracts on time, then Plaintiffs' salary requests were too high, and finally uncorroborated performance issues for Muslow only. A jury could easily disbelieve any of these explanations, especially where adverse employment actions were not taken against others (like Colletta) who sought raises.

[19] ROA.4746-48; *see also* ROA.16625 (Colletta asked for a raise from his initial offer and received it).

craft a new position for himself to justify an even higher salary than Muslow ever received, despite his lack of experience and tenure at LSU, only bolsters these fact issues.[20]

Defendants' admissions alone are more than enough to "cast doubt" on Defendants' explanations for their conduct, "enabling a reasonable factfinder to conclude that [they are] false[.]" *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002). Plaintiffs at least raised a fact issue on pretext, warranting reversal on their EPA and Title VII retaliation claims.

## II. Reversal is warranted on Plaintiffs' EPA discrimination claims because Defendants ignore Plaintiffs' more-for-less-pay pathway and did not prove any affirmative defense.

LSU's entire EPA discrimination response hinges on its theory that Plaintiffs failed to prove comparators performing perfectly "equal work." (LSU Resp. 21-31.) That theory suffers from two fatal flaws: (1) when a woman makes *less* money for a position requiring *greater* skills and responsibilities, the "unequal work" defense does not apply; and (2) a perfect comparator is not the EPA standard, and Plaintiffs also offered valid comparators who at least raise fact issues as to "equal work."

---

[20] ROA.4741-4754.

Because Plaintiffs established their prima facie EPA discrimination claims, Defendants had the burden to prove as a matter of law one of the EPA's enumerated defenses. They could not simply by pointing to the Market Study, without further proof that the resulting compensation system was applied objectively. Reversal is also warranted on Plaintiffs' EPA discrimination claims.

### A. LSU ignores that EPA liability exists because Plaintiffs received less pay for jobs requiring greater skill and responsibility.

LSU acknowledges the CFR provisions that prevent a defendant from hiding behind "unequal work" where a plaintiff shows *greater* responsibilities or skill for *less* pay. (LSU Resp. 21; Op. Br. 44-46 (citing 29 C.F.R. § 1620.13 and 29 C.F.R. § 1620.14).)[21] Yet the rest of LSU's Response ignores that pathway entirely, instead repeatedly questioning only whether Plaintiffs' proffered comparators performed perfectly "equal work." (LSU Resp. 21-31.) Not once in its Response does LSU assert, for example, that every proffered comparator had *more* or *even equal* work responsibilities or skills as Plaintiffs. And its own Market Study would negate any such assertion, or at least create a fact issue

---

[21] *See also*, *e.g.*, ROA.13264-65, 13211-12.

about it because Plaintiffs showed numerous men in *lower* paygrades making *more* money. (Op. Br. 12-14, 56-58, 63-65.)

Recognizing the problem the Market Study poses for its position, LSU now tries to undercut the very study that it commissioned and created. LSU asserts, for example, that the Market Study contains "no facts regarding the skill, effort, and responsibilities of any position." (LSU Resp. 24 (emphasis removed).) But the Market Study itself directly contradicts this assertion, as does the testimony of LSU's HR Director and creator of the Study, Rosalynn Martin—neither of which LSU addresses in its Response. The Market Study expressly states that the "HRM compensation team established job families[,]" and considered "knowledge, skills and abilities (competencies)" as well as "key behaviors" to group jobs together:

> Prior to commencing the market study, the HRM compensation team established job families. Job families are groupings of related jobs. HRM believed it necessary to have a way to organize unclassified jobs. Arranging jobs in this manner is a widely used process and assists the compensation team in responding to market pressures by quickly identifying impacted jobs. Jobs within a job family have many similarities in that they:
>
> - Require similar knowledge, skills and abilities (competencies).
> - Have a continuum of knowledge, skills and abilities that represent a career path from the lowest to the highest level job.
> - Possess associated and related key behaviors.
> - Have similar market competitive pay characteristics and conditions.

ROA.9917.

Martin also confirmed multiple times that the Study's job families and paygrade assignments were based on comparable skills and responsibilities:

- "Job families are used by compensation teams to organize or group ***similarly situated positions***."[22]

- Agreeing that "people who were in a particular pay grade, say, N30, were doing comparable—***had comparable responsibilities and duties*** and things of that nature[.]"[23]

- Individuals in the same paygrade are "***similar[ly] situated***[.]"[24]

- Agreeing that "a [N]37 ***has lesser responsibilities and work or whatever than someone who is in a higher paygrade*** like 40."[25]

LSU does not say Martin is wrong. Thus, LSU cannot now complain that the Market Study it created, under Martin's leadership, does not contain the inputs it says were included.

The Market Study reflects the in-depth analysis of LSUHSC-NO's "HRM compensation team" of the skills, effort, and responsibility

---

[22] ROA.16641 (emphasis added).

[23] ROA.16641-42 (emphasis added).

[24] ROA.16642 (emphasis added).

[25] ROA.16662 (emphasis added).

required of each unclassified position there, and the consequent grouping of positions into families and paygrades.[26] *See generally Brennan v. Victoria Bank & Tr. Co.*, 493 F.2d 896, 899 (5th Cir. 1974); *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571 (11th Cir. 1993). LSUHSC-NO disregarded any "apparent differences between jobs" within the same paygrade for wage purposes, so such jobs should be treated as "equal in all significant respects under the law." 29 C.F.R. § 1620.14. And LSU *does not dispute* the hierarchical nature of the paygrade system (which the district court rejected without basis), meaning that jobs in lower paygrades require less skill, effort, and responsibility than those in higher paygrades.[27]

The Market Study alone satisfies Plaintiffs' prima facie burden under the more-for-less pathway to EPA liability. (Op. Br. 12-13.) Muslow pointed to several comparators in the *same* job family and *lower* paygrades that made *more* money than she did. (*Id.*; Op. Br. 56 (chart of comparators in same job family).) And Cunningham showed that all three women in her N37 paygrade were paid *less* than the men in that

---

[26] ROA.12490-91, 16662.

[27] ROA.10064, 16662.

paygrade, as well as at least two other men in *lower* paygrades who made *more* than she did. (Op. Br. 9, 62-65.) Indeed, LSU's own regression analysis flagged the N37 paygrade as problematic. (Op. Br. 13-14.) All of this more than sufficed to shift the burden to Defendants to prove an EPA affirmative defense as a matter of law (which they did not do). *See* Section II.C, *infra*.

### B.    Plaintiffs also offered comparators for whom at least a fact question exists as to "equal work" status.

Plaintiffs did not stop with a showing of the independent "more for less" pathway to EPA liability though. They also offered individual comparators, each of which raises at least a fact question for the jury on "equal work" status.

Muslow, for example, offered her successor, Colletta.[28] (Jones Resp. 14 (admitting Colletta was hired to fill OGC role Muslow was invited to apply for).) LSU allowed him to craft a position for himself in a *lower* paygrade with a *much higher* salary than Muslow ever received, despite his lack of experience and tenure at LSU.[29] LSU claims this new position

---

[28] ROA.10166-67.

[29] ROA.10166-67; *see also* ROA.4741-54, 12619-20, 16534. The Chief of Staff position was originally slotted into the N38 paygrade (five paygrades lower than Muslow's

is too factually different from Muslow's to be worthy of comparison. (LSU Resp. 26-27.) But a jury could easily disagree (*see* Op. Br. 62), and LSU ignores the case law cited in Plaintiffs' Opening Brief that fact questions about whether a comparator performed "equal work" should go to the jury. (*See* Op. Br. 49-50 (collecting cases).)

Cunningham offered comparators that performed "equal work" too, and LSU's attacks on them fare no better. LSU does not dispute that Buhler made more money than Cunningham even though he was in a lower paygrade, meaning LSUHSC-NO considered his position as requiring less skill, responsibility, and effort. While the district court rightly acknowledged the "overlap" between Cunningham's and Buhler's positions,[30] it wrongly went on to reject him as a comparator based on differences that only reenforced that Buhler's position required less skill and responsibility than Cunningham's. (Op. Br. 63.) Those differences do not negate Buhler as a comparator; they bolster Plaintiffs' prima facie

---

position) and then later to N41, still two paygrades below Muslow's. ROA.12619-20; *see also* ROA.4747.

[30] ROA.10139-144, 14331.

showing of disparate treatment based on gender and at least raise a fact issue on the "equal work" pathway.

The same holds true for Wasser. LSU claims Plaintiffs somehow waived an analysis of the similarities between his and Cunningham's positions, but both parties and the district court addressed Wasser as a comparator below. (LSU Resp. 30; ROA.9245, 11864-66, 13273-75, 14333-35).) Just as with Buhler though, the district court incorrectly focused on perceived differences that again showed Cunningham's position required *more* skill and responsibilities and at minimum raise fact issues on "equal work."[31] (Op. Br. 64-65.)

The district court ultimately used inaccurate and outdated position descriptions[32] to find no comparator existed in the entire LSU system by looking at every conceivable difference—no matter how minor—between the proffered comparators' positions and Plaintiffs'. LSU's Response doubles down on this incorrect "perfect comparator" standard, under

---

[31] ROA.14333-35.

[32] Proof of flaws in the position descriptions is evident by looking at the description used to assign Muslow's position to the N43 paygrade—it described the role of a staff attorney reporting to the General Counsel, not the General Counsel herself. ROA.16801-03. Those flawed descriptions are not dispositive. *See also* Op. Br. 5 n.12.

which no individual at LSUHSC-NO could qualify as a comparator for Muslow, the only general counsel at the institution. LSU offers no defense for the outcome that strict view contemplates—an easy pathway to avoid EPA liability by simply hiring women into unique positions.

That cannot serve the EPA's "broadly remedial" purpose to "remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry[.]" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 208 (1974). Other courts have rejected a too "demanding gloss" on the EPA's "equal work" requirement, and this Court should as well. *Beck-Wilson v. Principi*, 441 F.3d 353, 363 (6th Cir. 2006) (quoting *Wheatley v. Wicomico Cnty.*, 390 F.3d 328, 334 (4th Cir. 2004)). And Plaintiffs still showed the "more for less pay" pathway, independently establishing EPA prima facie liability. *See* Section II.A, *supra*.

Because Plaintiffs showed prima facie EPA liability both via the more-for-less pathway and with individuals sufficiently comparable to go to the jury, the burden should have shifted to Defendants to establish an EPA enumerated defense as a matter of law. It did not, and they cannot.

24

**C.** **Defendants evaded their burden to prove an EPA affirmative defense as a matter of law.**

Defendants (except Hollier, who incorrectly states the law (Hollier Resp. 41)) do not dispute that to obtain summary judgment in the face of Plaintiffs' prima facie showing, they had to prove—beyond peradventure—one of the EPA's four affirmative defenses. (LSU Resp. 31); *Corning Glass*, 417 U.S. at 196-97; *King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 724 (5th Cir. 2011) ("the defendant bears the burden of *persuasion* to prove a defense under the EPA"). They nevertheless escaped that onerous burden when the district court improperly credited mere statements of those defenses instead of requiring legally conclusive proof of them.

A perfect example is LSU's statement that the Market Study constitutes a "gender-neutral job classification system," without going further to prove as a matter of law that the system was objectively implemented. (LSU Resp. 31; *see also* Hollier Resp. 42-43.) Defendants offered no legally conclusive proof that seniority explained Plaintiffs' low pay. Muslow's salary history alone negates such a showing, as Hollier initially raised her salary *below* and then later only *to the bare minimum*

of her paygrade, despite her more than 15 years of tenure.[33] Under the Market Study rubric, her salary should have been at or near the top of her paygrade.[34] That salary treatment stands in stark contrast to Edwin Murray, who had only two years of experience, his position required no advanced degree, and his position was in a lower paygrade. Yet, he made more money than Muslow.[35] And LSU ignores the results of a 2019 equity review, which requested a deeper dive into the reasons why men in Cunningham's N37 paygrade made more than women—something that "could not be explained by service time."[36]

Hollier tries to explain these discrepancies away with a purported policy that prevented him from adjusting Muslow's salary too much. (Hollier Resp. 43.) But he points to no written policy precluding salary

---

[33] ROA.10064, 10066, 16769.

[34] ROA.10064.

[35] ROA.9923.

[36] ROA.12606-07. LSU says that "HRM administrators testified that no gender-based pay inequities were found after the 2017 Market Study or after a 2019 equity review." (LSU Resp. 32.) And yet LSU ignores the equity review itself, which found otherwise and undermines any seniority defense. ROA.12606-07; *see also* Op. Br. 9.

raises of more than 20%. Nor did Martin testify as to any such policy.[37] And that alleged constraint is especially unconvincing given the salary decisions Hollier made for other members of his cabinet. He gave 25% increases to four individuals, with Buhler receiving a 43.75% increase in less than a year, prompting Buhler's department head to complain about this "clearly unjust" treatment.[38] Defendants also *do not even mention* the additional perks Hollier had sole discretion to award to other comparators.[39] The record simply does not show beyond peradventure any seniority system at LSUHSC-NO that would explain Plaintiffs' markedly lower salaries, whether before or after the Market Study.[40]

Nor did LSU (or Hollier) prove a merit system. (LSU Resp. 32; Hollier Resp. 43.) LSU briefly mentions "criteria" supposedly used to set salaries at LSUHSC-NO after the Study, but ignores Hollier's testimony about his carte blanche authority to set pay and award additional perks

---

[37] Instead, Martin testified that big adjustments needed to be made to bring every employee's salary to at least the minimum of their pay grade after the completion of the Market Study. ROA.12496, 16648, 16654.

[38] ROA.12521, 16789.

[39] Op. Br. 9.

[40] *See also* ROA.12606-07 (2019 equity review).

(which figure into compensation for EPA purposes).[41] (LSU Resp. 32.) LSU cannot rely on criteria without proof those criteria were actually used and in the face of testimony they were not.

LSU and Hollier then fall back on purported "performance issues" with Muslow, but cannot explain the absence of *any* contemporaneous documentation to support those allegations. (Hollier Resp. 43-44.) None existed in Muslow's personnel file—precisely why Martin questioned Hollier's initial decision not to increase Muslow's salary to at least her paygrade's minimum in 2017.[42] Hollier also admitted he had no formal discussions with Muslow regarding any so-called "complaints."[43] *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 236 (5th Cir. 2015)

---

[41] ROA.16595 (no objective factors identified in setting Muslow's salary); ROA.16599 (pay decisions subjective in Chancellor's Office); *see also* ROA.12381 (citing ROA.16654 (no documentation of objective criteria used in setting Muslow's salary)); Harman Resp. 6 (Plaintiffs' "rates and methods of payment [were] dictated by Chancellor Hollier"); ROA.7007-09.

[42] ROA.16650-51; ROA.16593 (no written documentation of poor performance); ROA.16645-46; ROA.16653 (no performance documentation for Muslow, even though such issues should be documented); ROA.16619 (no criticism in written form); *see also* ROA.16654 (person must be "almost two steps out the door. That's how serious it has to be to deny that person, in my mind, an adjustment to the minimum of a new pay grade"). Nor does LSU explain why the only other woman executive who directly reported to Hollier also received the same salary mistreatment. *See* Op. Br. 11 n.36.

[43] ROA.16591 (no performance review or formal meeting).

(failure to provide contemporaneous written documentation of any employee complaints created inference of falsity).

Perhaps most telling though, no Defendant addresses why, if Muslow had such performance issues, she was encouraged to apply for the OGC position she should have automatically transitioned to.[44] In fact, when Jones threw her name in the hat for the OGC job, members of the hiring panel ranked her as a top, "A" list candidate.[45]

Finally, Defendants' after-the-fact "performance" excuse does not explain Cunningham's low salary. Defendants have never alleged that it does. Nor do Defendants offer any reason why every man in Cunningham's paygrade made more money than every woman (a problem LSU itself flagged and could not explain).[46] A jury could easily discredit the performance excuse and conclude that no EPA defense exists. *See Thibodeaux-Woody v. Houston Comm. Coll.*, 593 F. App'x 280, 283 (5th Cir. 2014) ("a reasonable factfinder could reject [Defendant's]

---

[44] ROA.9375-76, 16733-34; *see also* ROA.6881-82, 6885-88, 6890, 7100.

[45] ROA.16917-920; *see also* ROA.16619.

[46] ROA.12606-07; *see also* Op. Br. 11 n.36 (discussing same salary mistreatment as Muslow for Hollier's only other female direct report).

defense on the ground that it discriminatorily applied its [] policy").
Defendants do not suggest any other enumerated defense.

Because Defendants did not prove as a matter of law an EPA
affirmative defense, reversal is warranted on Plaintiffs' EPA
discrimination claims. 29 U.S.C. § 206(d)(1); *Plemer v. Parsons-Gilbane*,
713 F.2d 1127, 1136 (5th Cir. 1983); *Beck-Wilson*, 441 F.3d at 365 (record
must show "that [the defendant] established the defense so clearly that
no rational jury could have found to the contrary" (quotation marks and
citation omitted)).

## III. Reversal is warranted on Plaintiffs' Title VII and Section 1983 discrimination claims because comparators exist, and Defendants offer only non-relevant or fact-intensive reasons for their conduct.

Defendants (with LSU taking the lead) regurgitate many of the
same arguments to combat Plaintiffs' Title VII and Section 1983 claims
as they do to try to support summary judgment on the EPA
discrimination claims. But Title VII's more lenient comparator standard
(which LSU all but ignores) only provides further confirmation of the
need to reverse the district court's judgment. Under that lenient
standard, Plaintiffs easily showed comparators sufficient to establish
their prima facie burden.

Defendants also rely on the same irrelevant, post-discrimination conduct, which, as already explained, cannot undermine Plaintiffs' claims. The only contemporaneous or pre-discrimination reasons Defendants offer raise multiple fact issues, warranting reversal.

### A.    Plaintiffs established comparators under Title VII's lenient standard, which Defendants cannot dispute.

To undermine Plaintiffs' prima facie case, LSU again attacks its own Market Study and urges adoption of what amounts to a perfect comparator standard for Title VII claims. For the same reasons explained in Section II, *supra*, and briefly again below, those attacks fail. (LSU Resp. 35-36; *see also* Hollier Resp. 29-34 (regurgitating district court's too-rigid comparator analysis)); *see Lenzi v. Systemax, Inc.*, 944 F.3d 97, 104, 109-11 (2d Cir. 2019).

The Market Study, commissioned and conducted by a team of LSU's own human resource professionals, grouped positions at LSUHSC-NO by their skill, effort, and responsibility—precisely the Title VII comparator inquiry. (Op. Br. 53-65.) That Study revealed several males in *lower* paygrades and even some with the same supervisors who made more money than Plaintiffs. (*Id.*) And Cunningham provided evidence that every male in her N37 paygrade made more than every female (including

her), and LSUHSC-NO's own equity review could not explain why.[47] That the only other female in Muslow's N43 paygrade made more money than Muslow does not negate Plaintiffs' prima facie showing. *See Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex because he favorably treats other members of the employees' group."); *Heath v. Bd. of Supervisors of S. Univ. & Agri. & Mech. College*, 850 F.3d 731, 741 (5th Cir. 2017) ("There 'is no token exception to anti-discrimination law.' . . . Evidence that Defendants favorably treated another female faculty member might be relevant for a jury to consider on the ultimate question of discrimination, but it is not dispositive at the summary judgment stage to warrant judgment for the employer as a matter of law.").[48]

The Market Study is not the only evidence that satisfies Plaintiffs' prima facie burden though. Muslow also pointed to her successor's disparate treatment, and Cunningham showed the overlap between her

---

[47] ROA. 9928-30, 12606-07.

[48] *See also Diaz v. Kraft Foods Glob., Inc.*, 653 F.3d 582, 587 (7th Cir. 2011) ("Title VII would have little force if an employer could defeat a claim of discrimination by treating a single member of the protected class in accordance with the law.").

position and those of Buhler and Wasser. *See* Section II.B, *supra*; Op. Br. 55-65. The Market Study alone, and bolstered by the individual comparators, easily satisfies Title VII's lenient comparator standard.

Trying to avoid that result, LSU weakly attempts to distinguish Plaintiffs' Title VII cases on the lenient comparator inquiry. (LSU Resp. 37.) But *Furnco* is far from unique in holding that the *McDonnell Douglas* analysis should not be applied in a "rigid, mechanized, or ritualistic" manner. *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978); *see also U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (same); *Johnson v. Louisiana*, 351 F.3d 616, 622 (5th Cir. 2003) (same).

Nor does this Court's *Merrill* decision conflict with anything Plaintiffs assert. *Merrill* involved a clearly erroneous review of findings made after a three-day bench trial. *See Merrill v. S. Methodist Univ.*, 806 F.2d 600, 605-07 (5th Cir. 1986). This case involves *de novo* review of whether Plaintiffs showed a prima facie case at the summary judgment stage. They did, not only based on comparable work, but also by showing they held positions requiring more skill and responsibility than men and yet received less pay.

More importantly, the point of *Gunther* (and *Reichhold*, which LSU ignores) is that the Title VII inquiry cannot be so rigid as to mean "a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay." *Washington Cnty. v. Gunther*, 452 U.S. 161, 178 (1981); *see also Reichhold Chemicals*, 988 F.2d at 1571 (Title VII was "designed to address" situation where "a woman is grossly underpaid but her job is not exactly comparable to a man's position"). Yet, that is precisely what LSU urges here—that Muslow and Cunningham could never be entitled to relief no matter the scenario because no man occupied their exact same positions.

Plaintiffs met their prima facie Title VII burden, showing they earned far less than comparable males under LSU's own rubric. That shifted the burden to Defendants to raise legitimate, non-discriminatory reasons for their conduct. *See generally Riser v. QEP Energy*, 776 F.3d 1191, 1200-01 (10th Cir. 2015).

**B.  Defendants continue to rely on irrelevant and fact-intensive nondiscriminatory reasons for their conduct, raising pretext and precluding summary judgment.**

LSU again urges the same irrelevant, post-dated reasons for its discriminatory conduct to defend against Plaintiffs' Title VII claims. (LSU Resp. 40-41.) But the eventual "retirement" of Plaintiffs' LSUHSC-NO positions and their alleged failure to apply for the OGC positions in later 2019 has nothing to do with their unfair pay in early 2019 and for years prior.[49] Those are not *legitimate* reasons for Plaintiffs' low compensation, so they neither satisfy Defendants' *McDonnell Douglas* burden nor warrant any response from Plaintiffs (though they offered one). *See Badgerow*, 974 F.3d at 619. Again, there was no waiver of a burden Plaintiffs did not have. (LSU Resp. 42.)

That leaves LSU with just a few excuses for Muslow's discriminatory pay, none of which has merit: (1) that, despite contrary evidence, Muslow was not a vice-chancellor and therefore not entitled to a pay raise in October 2018 or additional perks like a car allowance at any time; and (2) alleged performance issues with no contemporaneous supporting documentation.

---

[49] ROA.14338.

The first reason suffers from at least four serious problems.

*First*, Muslow's pay was discriminatorily lower than her male counterparts well before the October 2018 pay raises, which only exacerbated those differences. The Study showed Muslow's low pay as of 2017 and before; yet, her salary was relegated to the very bottom of her paygrade, despite her 15+ years of experience.[50] Other male comparators with less experience and in lower paygrades made more than her.[51] Hollier fully admitted to his discretion over pay decisions at LSUHSC-NO,[52] easily enabling a reasonable juror to find he harbored discriminatory intent for Title VII and § 1983 purposes. (*See also* Harman Resp. 7 (stating Hollier made pay decisions at LSUHSC-NO).)[53] The October 2018 pay raises cannot explain Muslow's long-standing salary underpayment.

---

[50] *See*, *e.g.*, Op. Br. 3-4, 8; ROA.6408, 9886, 10064, 16870.

[51] Op. Br. 12-13, 56-58.

[52] ROA.16595, 16599; *see also* ROA.7007-09, 12381, 16654; Harman Resp. 6.

[53] Hollier's waiver argument on his discriminatory intent fails given his correct admission that Title VII and Section 1983 are parallel causes of action (Hollier Resp. 35), and Plaintiffs have continuously highlighted his role in the discriminatory pay decisions at LSUHSC-NO.

36

*Second*, Harman, who oversaw the HR Department and supervised the Director of Human Resources at LSUHSC-NO, ***twice*** asserted in his Response brief (just like in his Statement of Material Facts below[54]) that Muslow was a vice-chancellor. (Harman Resp. 1, 6-7.) That means she should have been entitled to a car allowance and other perks Hollier says he reserved only for vice-chancellors. Harman's unequivocal assertions regarding Muslow's status create fact issues LSU cannot avoid. (LSU Resp. 43.)

*Third*, and relatedly, LSUHSC-NO's organization chart lists Muslow at the same level as a vice-chancellor, supporting Harman's assertions.[55]

*Fourth*, Colletta, Muslow's successor, received a car allowance because Hollier deemed him at "the same level as a vice chancellor."[56] For Colletta then, it was enough to be at "the same level as a vice chancellor" to receive added salary benefits; but not for Muslow. That is precisely the

---

[54] ROA.6333.

[55] ROA.6913.

[56] ROA.10418, 10166.

sort of pick-and-choose treatment that permits a reasonable factfinder to find pretext and discriminatory intent.

The vice-chancellor excuse therefore cannot support summary judgment for LSU, and neither do the only other two excuses offered—alleged performance issues and a so-called policy against 20+% raises. Again, a reasonable juror could easily discredit the suggestion that performance issues explain Muslow's much lower pay. *See* Section II.C, *supra.* And a reasonable factfinder could easily reject Hollier's argument that Muslow's low salary was due to constraints on raises of more than 20%.[57] *See* Section II.C, *supra.* Those excuses are rife with fact issues, precluding summary judgment on Muslow's claims.

As to Cunningham, Defendants offer just one excuse for her lower pay—that she was ineligible for any equity raise because of her part-time status. But *Hollier* ultimately decided to exclude part-time employees from equity raise considerations, even though they are undoubtedly covered by Title VII (and the EPA).[58] LSU cannot hide behind a "policy"

---

[57] ROA.10625-26, 16590, 16593-94, 16789.

[58] ROA.16657 ("the chancellor ultimately decided" that part-time employees were not eligible for equity considerations); *see also* ROA.9328-31.

that Hollier invented, and that disproportionately harms a protected class (women, who made up the majority of part-time employees at LSUHSC-NO).[59]

Defendants' irrelevant excuses and shifting explanations, as well as Plaintiffs' contrary evidence, all raise significant fact issues that would allow a reasonable juror to find pretext and preclude summary judgment. This same evidence also raises fact issues about Hollier's and Harman's discriminatory intent, as they were the ones making Plaintiffs' discriminatory pay decisions. Reversal is warranted on Plaintiffs' Title VII and corresponding § 1983 discrimination claims.

## IV. Defendants' other arguments do not entitle them to summary judgment.

Defendants' Responses contain a smattering of other arguments, none of which absolve them of liability. LSU's and Jones's procedural arguments are red herrings. Fact issues abound on each individual Defendant's "employer" status for EPA liability, which also precludes Skinner's undecided "remedial redundancy" defense. Qualified immunity

---

[59] ROA.16657. Defendants also do not address Plaintiffs' argument that discrimination claims under the EPA and/or Title VII cannot be prospectively waived by operation of unilaterally-enacted employer policies. *See* Op. Br. 69 n.144.

cannot save Harman and Hollier, as it too was not decided below and does not work given the clearly established anti-discrimination and anti-retaliation laws at issue. Finally, LSU admits its after-acquired evidence defense cannot prevent a remand, but at most can only limit Plaintiffs' remedies after trial. That defense, also not decided below, has dubious application here where the so-called bad conduct occurred long after Defendants' discriminatory and retaliatory conduct.

## A.    Defendants' procedural red-herring arguments are meritless.

LSU and Jones begin their Responses with two procedural complaints that are without merit or consequence.

*First*, they suggest this appeal is handicapped by Plaintiffs' failure to contest Defendants' statements of undisputed facts submitted at summary judgment. (LSU Resp. 19; Jones Resp. 20-21.) It is not. A quick look at those "undisputed facts" shows they are simply excerpts of testimony and documents now in the record on appeal.[60] Plaintiffs do not dispute the actual text of those documents or the testimony given (which

---

[60] *E.g.*, ROA.6760-6802, 7705-61, 9268-9310, 9820-76. Plaintiffs also submitted statements of contested facts. *E.g.*, ROA.11772-75, 11820-24, 11836-39, 11877-880.

is exactly what Plaintiffs said below).[61] Instead, Plaintiffs can and do raise controverting evidence that casts doubt on the veracity of Defendants' testimony and documents, as well as the resulting meaning and inferences that can be drawn from the evidence in support of Plaintiffs' claims. Defendants tellingly point to not one supposedly admitted "fact" in their prior statements they say is dispositive of this appeal.

*Second*, LSU and Jones confuse argument in Plaintiffs' Opening Brief with "conclusory assertions." (LSU Resp. 20; Jones Resp. 22-23.) Plaintiffs provided a plethora of record citations to support the facts asserted throughout their Opening Brief. The cherry-picked statements Defendants call "conclusory assertions" are summations of Plaintiffs' argument or rephrasing of fully-supported facts already cited in the brief.[62] There is no waiver or error in doing so in an appellate brief.

---

[61] *E.g.*, ROA.11772-75, 11836-39.

[62] *Compare* Jones Resp. 22 *with*, *e.g.*, Op. Br. 15-16 (citations regarding Plaintiffs' treatment as part of OGC team), 4 ("carte blanche" citations), 17-18 and 41-42 (Skinner's authority citations), 7-15 (comparator citations), 5 and 9 (subjective decision and additional perks citations), 22, 47 and 62 (Colletta citations).

41

## B. Fact issues preclude summary judgment for the individual Defendants on the EPA claims.

The individual Defendants spend most of their Responses trying to escape liability by denying "employer" status. But the EPA's anti-retaliation provision is not limited by an "employer" inquiry. It instead prohibits "any person" from "discharg[ing] or in any other manner discriminat[ing] against an employee[.]" 29 U.S.C. § 215(a)(3); *Arias v. Raimondo*, 860 F.3d 1185, 1191-92 (9th Cir. 2017) ("Congress clearly means to extend section 215(a)(3)'s reach beyond actual employers."); *Seong Song v. JFE Franchising, Inc.*, 394 F. Supp. 3d 748, 752 n.5 (S.D. Tex. 2019) (same). No individual Defendant challenges whether he would qualify as "any person."

Jones nevertheless claims this Court can ignore that clear statutory language under a dubious waiver theory. That is wrong. "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *see also U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) ("[A] court may consider an issue 'antecedent to . . .

and ultimately dispositive of" the dispute before it, even an issue the parties fail to identify and brief." (citation omitted)); *Stramaski v. Lawley*, 44 F.4th 318, 326 (5th Cir. 2022) (if issue "is a question of statutory interpretation, then this court is required to discern statutory meaning regardless of party argument"). This Court can and should properly apply the EPA retaliation clause.

And even if "any person" can be subject solely to criminal penalties and only on a showing of willful retaliatory conduct (a view that drastically limits the EPA's broad remedial purpose), fact issues still exist on whether Jones and the other individual Defendants qualify as "employers." And "employers" can certainly be liable for civil damages for retaliatory and discriminatory conduct under the EPA, as Jones readily admits. (Jones Resp. 27); *see also* 29 U.S.C. § 206(b).

The EPA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d); ROA.13213 (citing definition of "employer"). Not a single Defendant disputes that he acted directly or indirectly in LSU's interest

with respect to Plaintiffs, alone suggesting satisfaction of the "employer" test for each individual Defendant.[63]

Beyond that, under this Court's traditional economic-realities test for "employer" status, fact issues preclude summary judgment for the individual Defendants. They continue to employ a strategy of "it was him, not me," hoping to convince the Court that not one of them qualifies as an "employer." Harman blames Skinner and Hollier; Hollier blames Skinner and Harman; and Skinner and Jones blame Hollier. This finger-pointing has the opposite effect; it demonstrates fact issues for *all of them*.

**Hollier.** Hollier *does not dispute* that he qualified as Muslow's "employer" through December 2018 (Hollier Resp. 37-39), and the other Response briefs confirm as much. (Jones Resp. 31; Harman Resp. 1; Skinner Resp. 4.) Because there is no dispute that Hollier was Muslow's "employer" for a significant part of the timeframe underlying her EPA

---

[63] Jones spends several pages of his Response trying to characterize his conduct as all within his official capacity, such that he somehow cannot be liable individually. (Jones Resp. 24-29). But the EPA's "employer" definition does not make such a distinction. For the reasons explained in this Section, at least fact issues exist as to whether he would qualify as an "employer" under that broad definition and this Court's economic-realities test.

discrimination claims, the district court erred in *sua sponte* dismissing those claims against him in their entirety.[64]

Hollier also cannot escape EPA liability by claiming: (1) that he was not Plaintiffs' employer in early 2019 because Skinner exercised control over them; and (2) that he was not Cunningham's employer because she reported to Muslow.

*First*, as to early 2019, summary judgment should not have been granted for Hollier when he and Skinner accused each other of control over Plaintiffs. (Skinner Resp. 12.) Hollier says Skinner exercised control because he rescinded Plaintiffs' transfer to the OGC and directed Hollier to terminate their positions at LSUHSC-NO. Skinner says Hollier exercised control because he decided Plaintiffs' pay (Skinner Resp. 6-7, 22) and actually terminated their positions with LSUHSC-NO. (*See also* Harman Resp. 7 (decisions related to Plaintiffs' positions made by Skinner, with Hollier's consent).) That finger-pointing should have

---

[64] ROA.14363, 14367, 14373.

precluded summary judgment for Hollier on his "employer" status in early 2019.

*Second*, Hollier cannot escape liability on Cunningham's EPA claims because he *does not refute* the role he played in her pay decisions and termination. (Op. Br. 41.) Martin testified that Hollier decided part-time employees like Cunningham could not receive equity pay adjustments.[65] And *he* terminated Cunningham's position after Skinner stopped her transition to the OGC. (Hollier Resp. 15, 37 (acknowledging "he eliminated Appellants' positions (as directed by OGC)").) This too implicates several factors of the economic-realities test, precluding summary judgment for Hollier on his employer status as to Cunningham. (Op. Br. 39-40.)

**Skinner.** For many of the same reasons, summary judgment for Skinner on his "employer" status over Plaintiffs in early 2019 was also wrong. Skinner admits he had the authority to and did rescind Plaintiffs' transfer to the OGC after Muslow's pay-equity email. (Skinner Resp. 22.) Before then, Skinner welcomed Plaintiffs to the OGC and admits he gave Muslow a work assignment. (Skinner Resp. 13.) And Hollier testified that

---

[65] ROA.16657.

Skinner controlled Plaintiffs and ultimately directed Hollier to terminate them. (Hollier Resp. 38 ("Skinner would have direct supervising responsibility over the consolidated OGC positions."); Hollier Resp. 15 (he "agree[d] to retire the LSUHSC legal positions" at "Skinner's directive"); Hollier Resp. 26 ("the decision to terminate Appellants' positions with LSUHSC [was] in compliance with the OGC's decision").).

All of this raises fact questions regarding Skinner's power to hire and/or fire Plaintiffs and his supervisory authority over them. To avoid that result, Skinner and Hollier raise a novel argument that the use of the conjunctive "and" when courts mention the "hire and fire" factor means a plaintiff must show that a defendant can do both. None of the cases Defendants cite explicitly support that restrictive reading. Rather, as the case law makes clear, the factors only serve to inform the central inquiry—whether the individual exhibits control in the relationship. *See Gray v. Powers*, 673 F.3d 352, 354-55 (5th Cir. 2012); *Chapman v. A.S.U.I. Healthcare & Dev. Ctr.*, 562 F. App'x 182, 184-85 (5th Cir. 2014).

Fact issues exist over that control where Skinner had the authority to hire Muslow's replacement and to stop Plaintiffs' transition to the OGC.

Skinner also exhibited control over Plaintiffs' rate of pay at the OGC. Skinner says that "the amount of pay that the OGC [*i.e.*, Skinner] ***chose to offer*** in Appellants' employment contracts was simply an extension of their existing salaries at LSUHSC-NO[.]" (Skinner Resp. 23 (emphasis added).) In other words, Skinner *chose* to continue to pay Plaintiffs discriminatory salaries well below those specified by LSUHSC-NO's Market Study. Continuing discriminatory conduct that had occurred for years prior does not absolve Skinner of liability, regardless of whether he set salaries of Plaintiffs' proffered comparators. And Skinner's office hired Colletta (Muslow's replacement), who Jones and Skinner did not terminate for asking for a raise. Instead, Colletta got one

and was provided a pathway to make far more than Muslow ever did.[66] (LSU Resp. 25-26; *see* Hollier Resp. 11.)

Because several factors of the economic-realities test are implicated for Skinner as well, he too should not have been awarded summary judgment.

**Harman.** Harman's Response does little more than regurgitate the district court's errors and try to shift blame to Hollier and Skinner. (Harman Resp. 7, 12.)

But Harman does not dispute record evidence (from the sealed record in this appeal and cited properly in Plaintiffs' brief) that he exercised at least some authority over salary decisions at LSUHSC-NO. (Op. Br. 42.) After all, he was the Vice Chancellor of Administration Finance. (Harman Resp. 2.) Indeed, he repeatedly emphasizes that he recommended Muslow receive a salary increase, only bolstering a conclusion that he had a say in Plaintiffs' pay. (Harman Resp. 3, 12.) And recommending a minimal raise and recommending fair pay are not the same thing. His involvement in pay decisions not only shows an

---

[66] *See* pgs. 15-16, 21-22, *supra*; Op. Br. 49-50.

"employer" factor, but could lead a reasonable jury to infer he harbored discriminatory intent against Plaintiffs.

Beyond that, Harman admits the Director of Human Resources reported to him, and the HR Department maintained Plaintiffs' employment records. (Harman Resp. 7.) And he does not refute that he participated in drafting letters informing Plaintiffs that their positions would be terminated.[67] How much Harman was involved in and influenced those termination decisions is quite relevant to, and raises a fact question on, his "employer" status as well.

**Jones.** Jones admits that at least as of January 4, 2019, his responsibilities included "planning, organizing and directing OGC staff and OGC counsel" at LSUHSC-NO. (Jones Resp. 5; *see also* Jones Resp. 34 ("responsibilities including overseeing, planning, organizing, and directing the legal staff of the OGC, including OGC counsel housed at separate facilities" (emphases deleted).) Plaintiffs were formally welcomed to, and Muslow received work assignments from, the OGC. At least a fact issue therefore exists as to Jones's supervisory role over Plaintiffs in the early part of 2019.

---

[67] ROA.16604-05.

Jones also admits he played a role in drafting Plaintiffs' termination letters. (Jones Resp. 35; *see also* Skinner Resp. 11 ("After conferring with Jones," Skinner rescinded Plaintiffs' OGC employment contracts).) The fact issues that exist about Jones's supervisory authority over, and involvement in the termination decisions of, Plaintiffs should have precluded summary judgment on his "employer" status too.

* * * * * * * * *

Given the abundant fact issues as to each individual Defendant's "employer" status, reversal of summary judgment for them on Plaintiffs' EPA claims is warranted.

## C.    Plaintiffs' EPA claims against Skinner are not a remedial redundancy.

Skinner is the only Defendant to urge a novel, two-paragraph argument that the EPA claims against him should be dismissed as "remedial redundancies." (Skinner Resp. 24-25.) He points to one unpublished case from this Court in support of that argument, which the district court did not address on the merits below. (Skinner Resp. 24-25 (citing *Suter v. Univ. of Tex. at San Antonio*, 495 F. App'x 506 (5th Cir. 2012).) In a footnote, this Court said in *Suter* that it was unnecessary to decide the remedial-redundancy issue, but indicated agreement with

reasoning that it might exist in the EPA context. *Id.* at 511 n.4; *see also Traylor v. S. Components, Inc.*, No. 18-CV-0775, 2019 WL 3526358, at *3 (W.D. La. Aug. 1, 2019) (noting that "consensus is lacking regarding individual liability under the Equal Pay Act[,]" but relying on *Suter* to find claims against supervisor redundant).

However, this Court has held that the Fair Labor Standards Act definition of "employer"—which applies to the EPA—"is 'sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-à-vis its employees.'" *Reich v. Circle C. Invs.*, 998 F.2d 324, 329 (5th Cir. 1993); *see also Trevino v. United Parcel Serv.*, No. 3:08-CV-0889-B, 2009 WL 3199185, at *5 (N.D. Tex. Oct. 5, 2009) (analyzing similar definition of "employer" under FLMA and noting that "[f]or liability to attach, an individual 'must independently exercise control over the work situation'" (quoting *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984)). The question again comes down to control and, as explained in Section IV.B, *supra*, fact issues exist on the individual Defendants' control over Plaintiffs' here.

Skinner's remedial redundancy argument should therefore be rejected because Skinner may ultimately independently qualify as an "employer." He provides no compelling reason to dismiss Plaintiffs' claims against him at summary judgment. If there is truly a remedial redundancy at judgment formation, the district court can address it then.

### D. Harman and Hollier cannot hide behind qualified immunity.

The district court did not address qualified immunity in its opinion, but Harman and Hollier nevertheless suggest they can avoid Plaintiffs' discrimination and retaliation claims on this ground. (Harman Resp. 12-13; Hollier Resp. 35.) Harman raises an unsupported "ministerial" function argument (Harman Resp. 12-13), while Hollier simply says he is entitled to immunity (Hollier Resp. 35).[68] The defense has no merit here.

Harman's reliance on his acts as "ministerial" is curious given that the ministerial-duty exception traditionally **negates** a defense of qualified immunity, not supports it. (Harman Resp. 13); *e.g.*, *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997) ("Where, as here, a section 1983 defendant pleads qualified immunity and shows he is a

---

[68] Plaintiffs disputed the applicability of that defense below. ROA.11818-19.

governmental official *whose position involves the exercise of discretion*, . . ." (emphasis added)); *Gagne v. City of Galveston*, 805 F.2d 558, 559-60 (5th Cir. 1986) (rejecting argument that qualified immunity *did not apply* because acts were "ministerial," finding that exception "extremely narrow in scope"); *Sellers By & Through Sellers v. Baer*, 28 F.3d 895, 902 (8th Cir. 1994) ("First, we have been unable to find any post-*Davis* cases in which a court has *denied* qualified immunity because the official was performing a ministerial task." (emphasis added)).

In any event, this Court and others have questioned the continued viability of that exception, instead focusing on whether the constitutional or statutory rights at issue were clearly established at the time of the conduct. *See*, *e.g.*, *Davis v. Scherer*, 468 U.S. 183, 196 (1984) (no qualified immunity where "rights were clearly established at the time of the conduct at issue"); *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000) ("A right is 'clearly established' if its 'contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987))).

Here, Plaintiffs' rights to be free of discrimination and retaliation in the workplace are clearly established. Harman's and Hollier's participation in decisions to pay them less than men in comparable positions and/or to retaliate against them for raising gender-pay concerns violate those clearly-established rights. *See* 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 206; 29 U.S.C. § 215(a)(3); *see, e.g.*, *Wooley*, 211 F.3d at 919; *cf. Piatt v. City of Austin*, 378 F. App'x 466, 469 (5th Cir. 2010) ("Thus, generally, where the evidence is sufficient to support a claim of intentional gender or race discrimination, any immunity defense will be foreclosed."); *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 339 (5th Cir. 2003) ("An objectively reasonable public official in the years 1997 through 1999 would have known that retaliating against a faculty member for exercising his legal right to file an EEOC charge of discrimination was prohibited by law.").

Qualified immunity therefore does not apply or, at a minimum, fact issues preclude summary judgment in Harman's and Hollier's favor on this unaddressed defense. *See Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 278 (5th Cir. 2015) (fact questions precluded summary judgment on qualified-immunity defense).

### E.   LSU's after-acquired evidence defense does not avoid remand.

LSU finally raises an after-acquired evidence defense that it rightly admits does not avoid liability or remand, but instead potentially affects only Plaintiffs' remedies. (LSU Resp. 54.) The district court did not decide the applicability of that defense, and LSU offers no compelling reason for this Court to address it now in the first instance.

If this Court is inclined to do so though, LSU's assertions as to the defense's applicability are dubious. LSU bases that defense on purported conduct that occurred long *after* Defendants' retaliation and discrimination. (LSU Resp. 55-56.) None of LSU's cited cases involve such a factual scenario; instead, they involved conduct *before* or *at the same time as* the employer's discrimination or retaliation. (LSU Resp. 56.) Plaintiffs have found no cases supporting the defense's application where, as here, the alleged misconduct came well after the discrimination and retaliation and therefore could not alternatively justify the adverse

employment actions.[69] The after-acquired defense should not apply here and cannot stop a remand in any event.

## V. Defendants offer no compelling reason to avoid reassignment.

No party disputes the applicable standard for reassignment: it boils down to the need to preserve the appearance of fairness and justice. *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 892-93 (5th Cir. 2021). The course of proceedings below, and the statements made by the district court in its orders, show the district court's overt skepticism about the merits of Plaintiffs' claims. (Op. Br. 70-73.) A reasonable observer would question whether the judge could overcome that expressed skepticism to reach a fair and just decision on remand. That is enough to justify reassignment.

In protesting that result, Jones tries to explain away the different standards applied to the parties below. (Jones Resp. 44-46.) But he cannot dispute the district court's willingness to accept late papers from Defendants, but not Plaintiffs. (Op. Br. 71.) There was no trial date or any other looming deadline at the time Plaintiffs requested leave to file

---

[69] Plaintiffs also independently dispute whether the egregiousness of such purported conduct could justify any adverse action. *See*, *e.g.*, ROA.12384-85.

a sur-reply, negating any "clear prejudice" as Jones puts it. (Jones Resp. 45.) Jones also does not explain why Plaintiffs had to produce tax returns, but not certain individual Defendants whose returns were indisputably relevant to certain damage claims. (Op. Br. 72.) And while he tries to defend the district court's ruling ordering Cunningham's former employer to produce decades-old disability records, he ignores that the district court *overturned* a magistrate judge decision denying such production as beyond the scope of discovery and authorizations Plaintiffs were compelled to sign. (Jones Resp. 46; Op. Br. 72.)

The rest of Jones's argument tries to paint Plaintiffs as bad litigants to taint this Court's view of the merits of their claims. The sanction Jones emphasizes arose out of the misinterpretation of a protective order, which Plaintiffs accepted responsibility for. (Jones Resp. 49.) That misunderstanding does not at all bear on the merits of their claims, as fully established by the record properly before the district court and this Court. The district court nevertheless found otherwise, in an opinion that repeatedly expressed undue skepticism of Plaintiffs' claims

and made *sua sponte* findings that Defendants do not even try to support on appeal.[70]

In sum, a reasonable observer could question the district court's ability to put aside its prior views based on the course of proceedings below and the gratuitous statements of suspicion and dislike of Plaintiffs' claims in both its summary judgment opinion and order on reconsideration. Plaintiffs recognize the gravity of their request, but nevertheless are compelled to make it to ensure fair proceedings below.

## CONCLUSION

For these reasons and those in their Opening Brief, Plaintiffs respectfully request the relief outlined in their Opening Brief.

---

[70] As a few examples, the district court found Plaintiffs did not prove the Market Study paygrades were hierarchical, even though no one ever argued otherwise. ROA.14328-29. Indeed, that structure was apparent on the Study's face and confirmed by LSU's HR Director. ROA.10064, 16662. The district court also found Plaintiffs' prima facie retaliation case based on Muslow's pay-equity email "suspect," even though again, LSU had never questioned that email or Skinner's immediate response to it. ROA.14346. And the district court granted summary judgment for Hollier on Plaintiffs' EPA claims, finding he was *never* their employer even though Hollier did not dispute he was Muslow's "employer" until at least December 2018. ROA.14362-67, 14373.

DATED: March 16, 2023        Respectfully submitted,

/s/ *Kelli Benham Bills*

Anne McGowan Johnson
Texas Bar No. 00794271
ajohnson@tillotsonlaw.com
Kelli Benham Bills
Texas Bar No. 24067169
kbills@tillotsonlaw.com
**TILLOTSON JOHNSON & PATTON**
1807 Ross Ave., Suite 325
Dallas, Texas 75201
(214) 382-3041 Telephone
(214) 292-6564 Facsimile

Counsel for Plaintiffs-Appellants

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document is being served on all counsel of record herein on March 16, 2023 by the Court's ECF system.


/s/ *Kelli Benham Bills*
Kelli Benham Bills

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 5th Cir. R. 32.2, as extended to 13,000 words per this Court's Order dated January 26, 2023, because this brief contains 11,022 words, excluding the parts of this brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) and 5th Cir. R. 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-Point Century Schoolbook font, with footnotes in 12-point font.

/s/ *Kelli Benham Bills*
Kelli Benham Bills